**SCANNED**

RECEIVED
SDNY PRO SE OFFICE
2019 JAN 28 AM 11: 33

Jacoub Solomon aka MeDiAAiDeM

_Fill in above the full name of each plaintiff or petitioner._

Case No. **19** CV **CV** **815**

-against-

Spotify USA, Inc

48 W 18th street, 7th Floor

New York, NY 10011, USA

office@Spotify.com

_Fill in above the full name of each defendant or
respondent._

# DECLARATION

Preventing growth and providing false stream data to public, collectives and CRB, of all

MeDiAAiDeM's music, is unlawful to CFR Title 37, CRDRA of 2004 and Title 15 of U.S.C.

_Briefly explain above the purpose of the declaration, for example, "in Opposition to Defendant's
Motion for Summary Judgment."_

I, Jacoub Solomon aka MeDiAAiDeM , declare under penalty of perjury that the

following facts are true and correct:

_In the space below, describe any facts that are relevant to the motion or that respond to a court
order. You may also refer to and attach any relevant documents._

1. Spotify has not engaged in "good faith" to report accurate stream data to collective(s).

Stream data that is displayed on Spotify.com, for all songs by MeDiAAiDeM is <1000.
It's fake and it prevents accurate Royalty payments. (It's an underpayment over 10%)

2. Currently, LandR.com is the only aggregator MeDiAAiDeM uses to publish his music
to streaming sites. MeDiAAiDeM gave discretion to LandR to upload his music to Spotify.
Spotify.com is the only site to publish the music MeDiAAiDeM submitted to LandR.com.

3. Album: "A Metronome Sang Farewell" was published on Spotify.com, 8/28/2018.

Single: Breaking News (Directors Cut) was published 9/14/2018 on Spotify.com. Single: I Might (An Intermission) was published 12/14/2018 on Spotify.com.

4. LandR states, "they are at the mercy of digital stores for stream data and Royalty payments". As of 1/27/2018, LandR.com reported, MeDiAAiDeM received a total of 351 streams for a Royalty payment of $1.11. Spotify.com reported 353 streams.

5. For all songs published with Spotify.com via LandR.com, MeDiAAiDeM is the writer, producer, engineer, performer and owner. No other label, publisher nor person has contributed to his music or is entitled to any percentage of his music.

6. All songs published on Spotify.com are registered with BMI. MeDiAAiDeM controls 200% for all songs. MeDiAAiDeM claims all rights as well on LandR.com.

7. According to BMI's website, Public Performance Royalties are paid at least 9 months from date of release.

8. False stream data and reportage to BMI and other collectives will reflect all future Royalty payments, which can result in improper money management and bankruptcy.

9. Major artist on Spotify.com relish high streams. An audit can prove validity. They are able to maintain popular consistency. As a new artist, competition should only be preference or talent of ones work, not computer software data manipulation.

10. Low streams via software manipulation, can damage a new artist financially and musically. As well as their credibility. It can prevent an artist to work with TV, Radio, and public venues. Companies and other media outlets may judge an artist from their stream display and Royalty pay. Numbers play a big part with growth in the music industry, especially if website's claim their streams/views are accurate.

11. MeDiAAiDeM is unable to trade streams within US and foreign, for precise Royalty. No alternative's have yet been found by MeDiAAiDeM to make an income from his music.

12. MeDiAAiDeM has not withdrawn any of the earnings from LandR.com ($1.11).

Attach additional pages and documents if necessary.

1/28/2019

Executed on (date)

Signature

Jacoub Solomon aka MeDiAAiDeM

n/a

Name | Prison Identification # (if incarcerated)

2550 olinville ave, APT #15D | Bronx | NY | 10467

Address | City | State | Zip Code

917-520-4702 | jacoubsolomon@yahoo.com

Telephone Number (if available) | E-mail Address (if available)

**RE: Royalty Fraud because of fake stream data.**

From: crb (crb@loc.gov)

To: jacoubsolomon@yahoo.com

Cc: crb@loc.gov

Date: Thursday, January 24, 2019, 7:57 PM EST

Mr. Solomon,

DART royalties are unrelated to any royalties he might be entitled to from Spotify. If you have a complaint about Spotify, you should contact Spotify.


United States
**CRB** Copyright Royalty Board

**From:** jacoubsolomon@yahoo.com <jacoubsolomon@yahoo.com>
**Sent:** Wednesday, January 23, 2019 1:54 PM
**To:** crb <crb@loc.gov>
**Subject:** Royalty Fraud because of fake stream data.

Email: jacoubsolomon@yahoo.com
Name: Jacoub Solomon aka MeDiAAiDeM
Subject: Royalty Fraud because of fake stream data.
Question: My music has been on Spotify, since 8/28/2018. However my streams are way lower than it should be(<1000). The profile displays the same stream number, no matter of the numerous views to its domain. On 1/18/2019, I was not paid any royalty (underpayment over 10%) from BMI for my first paycheck. Should I just file a claim via DART? sincerely, MeDiAAiDeM "A metronome sang farewell" All songs are registered with BMI. MeDiAAiDeM owns 200% for all songs. I produced, engineered wrote, performed and recorded all songs by myself.

CRB
inquiry

## Re: Stats [ ref:_00DD0pxIW._5005721hgFo:ref ]

From: jacoub solomon (jacoubsolomon@yahoo.com)

To: artistsupport@spotify.com

Date: Thursday, January 3, 2019, 9:40 PM EST

Thanks for the reply.

This information is greatly appreciated. As well as the musical quality from Spotify.
Assuming the digital music provider engages in good-faith, Owners of their music should feel insured to expect accrued royalty payments once they are located.

Just a note:
I resolved my issue with ASCAP. I forgot that I was already enrolled with BMI. I didn't find out until the end of November when I visited the new ASCAP NYC office. They had discontinued my writer membership, but I still retain my ASCAP Publisher account. BMI was happy to register all my music (200%), and update my profile. Hence, I shall await for the next Quarterly Payment, Jan 18, 2019 from BMI.

MeDiAAiDeM

On Thursday, January 3, 2019, 3:04:12 PM EST, artistsupport@spotify.com <artistsupport@spotify.com> wrote:

Hey there,

Thanks for reaching out to us!

We're sorry to hear you're unhappy with the process regarding royalties.

Most releases on Spotify are delivered to us via labels and distributors. These services handle all the licensing and distribution of your music, and administer royalties when fans stream your tracks.

Exactly when and how much you get paid depends on whether you're signed to a label or you're independent. We recommend talking to your label or distributor for more information. For questions about publishing royalties, reach out to your publisher, PRO, or collecting society.

We hope this helps. Give us a shout if you need anything else!

All the best,
Keisha

ref:_00DD0pxIW._5005721hgFo:ref

SpoTify

## Re: Sign Up Access Requested By: MeDiAAiDeM [ ref:_00DD0pxIW._500571uRJh4:ref ]

From: artistsupport@spotify.com (artistsupport@spotify.com)

To: jacoubsolomon@yahoo.com

Date: Friday, September 7, 2018, 8:48 PM EDT

Hey there,

We appreciate you getting back with us. We'll be happy to shed some light.

All releases on Spotify are delivered to us via labels and distributors. These services handle all the licensing and distribution of your music, and administer royalties when fans stream your tracks.

For the most up-to-date info on your master royalties, we'd recommend getting in touch with your label or distributor.

For questions about publishing royalties, reach out to your publisher, or PRO. They're the best folks to help out!

Just a heads up, we consider any attempt to artificially increase stream counts a serious violation of Spotify's content guidelines.

Content detected to have been engaged in artificial streaming is removed from our service, and will remain down until further notice.

In the meatime, we've gone ahead and granted your request for Spotify for Artists acces !

To get started, just head here and log in, or download the Spotify for Artists mobile app.

Feel free to reach out if you need us again, we'll help in any way we can!

All the best,
Latoya


ref:_00DD0pxIW._500571uRJh4:ref



# Audience

## 353 streams



LISTENERS    **STREAMS**    FOLLOWERS

Since 2015



MeDiAAiDeM

Sat, Jan 26
0

Compare to other artists

## Sources of streams

STREAMS • LAST 28 DAYS



| Your Profile & Catalog | Their Own Playlists & Library | Other Listener's Playlists | Our Personalized Playlists | Our Editorial Playlists | Other |
|---|---|---|---|---|---|
| 33% | 34% | 0% | 11% | 0% | 22% |

# Audience

## 2 followers
TOTAL

LISTENERS    STREAMS    **FOLLOWERS**

Sat, Jan 26
**2**

**MeDiAAiDeM**

Compare to other artists

# Their gender



0% Female

100% Male

0% Non-binary

0% Not specified

# Their age



# Other artists they listen to

We'll show your related artists as more fans play your music on Spotify.

GET TIPS

# Where they listen

**United States**

**Iceland**

**United Kingdom**



1+                                    Spotify N/A

# Top cities

LISTENERS • LAST 28 DAYS

**Sheffield**

**Roseland**

**Altamonte Springs**

**Martinsburg**

**The Bronx**

**Reykjavik**

**Legal**        **Privacy**        **Cookies**                                        © 2019 Spotify AB

# About Us

With Spotify, it's easy to find the right music for every moment – on your phone, your computer, your tablet and more.

There are millions of tracks on Spotify. So whether you're working out, partying or relaxing, the right music is always at your fingertips. Choose what you want to listen to, or let Spotify surprise you.

You can also browse through the music collections of friends, artists and celebrities, or create a radio station and just sit back.

Soundtrack your life with Spotify. Subscribe or listen for free.

## Customer Service and Support

1. **Help site** (https://support.spotify.com). Check out our help site for answers to your questions and to learn how to get the most out of Spotify and your music.
2. **Community (https://community.spotify.com/).** Get fast support from expert Spotify users. If there isn't already an answer there to your question, post it and someone will quickly answer. You can also suggest and vote on new ideas for Spotify or simply discuss music with other fans.
3. **Contact us (https://support.spotify.com/us/contact-spotify-support).** Contact our Customer Support if you don't find a solution on our support site or Community.
4. **@SpotifyCares** (https://twitter.com/SpotifyCares). Feeling sociable? Simply tweet the team and they'll do all they can to help.

## Or pick a topic:

- Advertising on Spotify? Advertisers section (/brands/)
- Press query? Press section (https://press.spotify.com)
- Applying for a job? Jobs section (https://www.spotifyjobs.com/)

Spotify USA, Inc. provides the Spotify service to users in the United States. Spotify AB provides the Spotify service to users in all other markets.

## Spotify HQ

**Spotify USA Inc**
45 W. 18th Street
7th Floor
New York, NY 10011
USA
office@spotify.com

## Spotify around the world

**Spotify Belgium**
Kammenstraat 18
2000 Antwerp
Belgium
office@spotify.com

**Spotify GmbH**
Leipziger Straße 125
10117 Berlin
Germany
office@spotify.com

**Spotify Canada Inc.**
179 John St. Suite 403
M5T 1X4 Toronto
Canada
office@spotify.com

**Spotify Denmark ApS**
Vestergade 27, 1 th
1456 København K
Denmark
office@spotify.com

**SPOTIFY SPAIN SL**
Paseo de la Castellana
77
c/o WeWork
28064 Madrid
Spain
office@spotify.com

**Spotify Finland Oy**
Merimiehenkatu 36 D
FI-00150 Helsinki
Finland
office@spotify.com

**Spotify France SAS**
29-31 rue de
Courcelles
75008 Paris
France
office@spotify.com

**Spotify Italy S.r.l.**
c/o Fintech District
Via Filippo Sassetti 32
20124 Milano
Italy
office@spotify.com

**Spotify Netherlands**
Singel 540 3h
1017AZ, Amsterdam
Netherlands
office@spotify.com

**Spotify Norway AS**
Tordenskioldsgate 2
0160 Oslo
Norway
office@spotify.com

**Spotify Poland Sp. z o.o.**
Warsaw Skylight
Skylight Building, 14th floor
c/o Regus
Ul. Zlota 59
00-120 Warszawa

**Spotify AB**
Regeringsgatan 19
SE-111 53 Stockholm
Sweden
Reg no: 556703-7485
office@spotify.com

LandR
info

# [LANDR Rescue Squad] Re: Who is the Supervisor or Police of Fraud?

##- Please type your reply above this line -##

Your LANDR support request (183180) has been updated by one of our agents. To add additional comments, please reply to this email.

**Cinzia** (LANDR Rescue Squad)

Jan 3, 12:16 EST

Hey there,

Cinzia here, thank you for contacting us.
Glad you're releasing with LANDR.

**Whenit comes ot yoru statistics report please keep in mind that there is a delay of about 24-48 hours between a listeners play and the stats displayed on the dashboard whe your track has been released to stores.**

Our statistics reporting system is linked to the stores and unfortunately we are at their mercy as far as when data is relayed to us.

**Rest assured that we are tracking all stores and your earnings will be made available approximately 2-3 months after they are reported.**

Please keep in mind that we currently receive and display stream data from Spotify, Apple Music, Google Play, and Deezer. We're working hard with other platforms them to this list very soon.

**We unfortunately are at the mercy of the stores when receiving payment.**
**No worries if you don't see any earnings yet, they are coming!**

As is the case with all distributors, it usually takes between 2-3 months for us to get the money from digital stores once your release is streamed or sold.

*For example, if your tracks are steamed in January.*
*The stores reporting period will end January 31st and then 2 months from then they will pay out for those streams.*
*i.e. early April.*

**You'll need to create a PayPal account to withdraw your earnings from your LANDR account if you don't already have one. PayPal charges a 2% fee on your withdrawal to a maximum of $20USD.**

When it comes to legal inquiries, we are unable to advise you on this seeing how we are not lawyers. What I can suggest is contacting a PRO and entertainment lawyer about your inquires. I'm sure they'd be happy to help.

**Are you able to clarify what the issue you are having is specifically? Is it concerning one of your releases with LANDR? If so, which one?**

Hope this helps!
Let me know if there is anything else we can do for you.

All the best,
Cinzia


LANDR Rescue Squad

Spread The Word:

Facebook.com/LANDRmusic
Twitter.com/LANDR_music


**Jacoubsolomon**
Jan 2, 18:59 EST

Im sure no one wants to be neglected of diligent royalty payments.
I talked with a representative from a PRO. They told me that they pay artist according to what a Streaming site displays or submits to the PRO. I guess the Treasurer of the US has great trust towards Streaming sites and PRO's with money dictation.

What would you do?............

If you have 2 billion streams, but the Spotify display shows 250?............

You talk with Spotify, but they tell you that your 250 streams are accurate and Fraud is not tolerated!

You've been waiting over 6 months and received no royalty as the Owner/artist.

What would be the most legal and professional way to acquire your appropriate royalty payment?

1. Maybe someone in LandR has been through this situation? What did they do?

2. Maybe Spotify is going through a lot of corruption and a Court decision is their last resort for prosperity. There could be a possibility the Founder of Spotify wants me to file a Lawsuit.

3. Maybe my music is worth a billion dollars, and an arrogant publisher wanted to cash in, by trapping me into a record deal to give up all my royalties. In exchange for radio play and TV placements.

4. Would a Publisher need LandR as their support in a Court Room, if a Lawsuit is filed?

5. What is the purpose of the MMA bill?

I appreciate your feedback, It would mean a great deed to Musicians and Publishers. A situation like this should not be swept under the rug.

MeDiAAiDeM

PS. Why would some one paint a picture of a Famous Rapper orchestrating "a money shot"?

(With the Statue of Liberty and a NY senator covering their mouth). This is a big mural located in NYC. It's been there for a while.

Is this what artist have to do? They have to give up all their royalty for fame? A 360 deal?

Attachment(s)

IMGA01651.jpg

[WVR294-79VY]

New Release

## Overview

⊞ Overview

◉ My releases

↗ Stats

▣ My money

| Top country | Total streams | Top streaming service |
|---|---|---|

**United States**

**351**


Spotify®

More details →    More details →    More details →

New Release



⊞ Overview

⊙ My releases

⤴ Stats

Trends

Earnings

My money

# Earnings

Total earnings

# $1.11 USD

→ Export

Last 12 months

1.00
0.80
0.60
0.40
0.20
0

Sep    Oct    Nov

| Start of reporting period | End of reporting period | Store | Store service | Country of sale or stream | Album | Track | Quantity of sales or streams | Earnings generated (USD) |
|---|---|---|---|---|---|---|---|---|
| 2018-08-01 | 2018-08-31 | Spotify | Spotify | PT | *A Metronome Sang Farewell* | Breaking News | 1 | 0.00023378211445120623323797355 |
| 2018-08-01 | 2018-08-31 | Spotify | Spotify | US | *A Metronome Sang Farewell* | Lets Be Famous | 1 | 0.0024614347724479462546798522 |
| 2018-08-01 | 2018-08-31 | Spotify | Spotify | US | *A Metronome Sang Farewell* | We Don't Give A What | 9 | 0.05130159616515447711293554876 |
| 2018-08-01 | 2018-08-31 | Spotify | Spotify | US | *A Metronome Sang Farewell* | Verde, Off Beat | 2 | 0.01140031025892321713620788861 |
| 2018-08-01 | 2018-08-31 | Spotify | Spotify | US | *A Metronome Sang Farewell* | Lets Be Famous | 1 | 0.00570015512946160856810394311 |
| 2018-08-01 | 2018-08-31 | Spotify | Spotify | US | *A Metronome Sang Farewell* | Breaking News | 2 | 0.01140031025892321713620788861 |
| 2018-08-01 | 2018-08-31 | Spotify | Spotify | US | *A Metronome Sang Farewell* | Morale, An Intro For An Outro | 1 | 0.00269856539323580680398900196 |
| 2018-09-01 | 2018-09-30 | Spotify | Spotify | AU | *A Metronome Sang Farewell* | A Metronome Sang Farewell | 1 | 0.00165952804236219167728156675 |
| 2018-09-01 | 2018-09-30 | Spotify | Spotify | CA | *A Metronome Sang Farewell* | We Don't Give A What | 1 | 0.00186315837522760599826065649 |
| 2018-09-01 | 2018-09-30 | Spotify | Spotify | FR | *A Metronome Sang Farewell* | Why Do You Try | 1 | 0.00249213888546032128362399408 |
| 2018-09-01 | 2018-09-30 | Spotify | Spotify | GB | *A Metronome Sang Farewell* | We Don't Give A What | 1 | 0.00452533974784284609930144412 |
| 2018-09-01 | 2018-09-30 | Spotify | Spotify | GB | *A Metronome Sang Farewell* | A Metronome Sang Farewell | 1 | 0.00452533974784284609930144412 |
| 2018-09-01 | 2018-09-30 | Spotify | Spotify | GB | *A Metronome Sang Farewell* | Morale, An Intro For An Outro | 1 | 0.00452533974784284609930144412 |
| 2018-09-01 | 2018-09-30 | Spotify | Spotify | GB | *A Metronome Sang Farewell* | More Than You Can | 1 | 0.00452533974784284609930144412 |
| 2018-09-01 | 2018-09-30 | Spotify | Spotify | GB | *A Metronome Sang Farewell* | We Don't Give A What | 1 | 0.00797415014453153458191546607 |
| 2018-09-01 | 2018-09-30 | Spotify | Spotify | GB | *A Metronome Sang Farewell* | Morale, An Intro For An Outro | 1 | 0.00797415014453153458191546607 |
| 2018-09-01 | 2018-09-30 | Spotify | Spotify | NZ | *A Metronome Sang Farewell* | A Metronome Sang Farewell | 1 | 0.00652315381147047606273723866 |
| 2018-09-01 | 2018-09-30 | Spotify | Spotify | SE | *A Metronome Sang Farewell* | A Metronome Sang Farewell | 1 | 0.00637463198478558738145228499 |
| 2018-09-01 | 2018-09-30 | Spotify | Spotify | SE | *A Metronome Sang Farewell* | Morale, An Intro For An Outro | 1 | 0.00637463198478558738145228499 |
| 2018-09-01 | 2018-09-30 | Spotify | Spotify | US | *A Metronome Sang Farewell* | Frankly, Im | 1 | 0.00253229328378961550577723766 |
| 2018-09-01 | 2018-09-30 | Spotify | Spotify | US | *A Metronome Sang Farewell* | We Don't Give A What | 2 | 0.00506458656575923101154447530 |
| 2018-09-01 | 2018-09-30 | Spotify | Spotify | US | *A Metronome Sang Farewell* | Quit Being Hard | 1 | 0.00253229328378961550577723766 |
| 2018-09-01 | 2018-09-30 | Spotify | Spotify | US | *A Metronome Sang Farewell* | Verde, Off Beat | 1 | 0.00253229328378961550577723766 |
| 2018-09-01 | 2018-09-30 | Spotify | Spotify | US | *A Metronome Sang Farewell* | Lets Be Famous | 1 | 0.00253229328378961550577723766 |
| 2018-09-01 | 2018-09-30 | Spotify | Spotify | US | *A Metronome Sang Farewell* | Vanity | 1 | 0.00253229328378961550577723766 |
| 2018-09-01 | 2018-09-30 | Spotify | Spotify | US | *A Metronome Sang Farewell* | Xeno Cowboy | 1 | 0.00253229328378961550577723766 |
| 2018-09-01 | 2018-09-30 | Spotify | Spotify | US | *A Metronome Sang Farewell* | A Metronome Sang Farewell | 2 | 0.00506458656575923101154447530 |
| 2018-09-01 | 2018-09-30 | Spotify | Spotify | US | *A Metronome Sang Farewell* | Good Drug | 1 | 0.00253229328378961550577723766 |
| 2018-09-01 | 2018-09-30 | Spotify | Spotify | US | *A Metronome Sang Farewell* | Morale, An Intro For An Outro | 3 | 0.00759687985136884651731871296 |
| 2018-09-01 | 2018-09-30 | Spotify | Spotify | US | *A Metronome Sang Farewell* | More Than You Can | 2 | 0.00506458656575923101154447530 |
| 2018-09-01 | 2018-09-30 | Spotify | Spotify | US | *A Metronome Sang Farewell* | Take Another Sniff | 1 | 0.00253229328378961550577723766 |
| 2018-09-01 | 2018-09-30 | Spotify | Spotify | US | *A Metronome Sang Farewell* | Zenith | 1 | 0.00253229328378961550577723766 |
| 2018-09-01 | 2018-09-30 | Spotify | Spotify | US | *A Metronome Sang Farewell* | Breaking News | 1 | 0.00253229328378961550577723766 |
| 2018-09-01 | 2018-09-30 | Spotify | Spotify | US | *A Metronome Sang Farewell* | Tramp | 1 | 0.00253229328378961550577723766 |
| 2018-09-01 | 2018-09-30 | Spotify | Spotify | US | *A Metronome Sang Farewell* | I Do, Take Me Higher | 1 | 0.00253229328378961550577723766 |
| 2018-09-01 | 2018-09-30 | Spotify | Spotify | US | *A Metronome Sang Farewell* | Why Do You Try | 2 | 0.00506458656575923101154447530 |
| 2018-09-01 | 2018-09-30 | Spotify | Spotify | US | *A Metronome Sang Farewell* | A Metronome Sang Farewell | 2 | 0.00842067019488717231964906640 |
| 2018-09-01 | 2018-09-30 | Spotify | Spotify | US | *A Metronome Sang Farewell* | Why Do You Try | 1 | 0.00321035509744358615982453310 |
| 2018-09-01 | 2018-09-30 | Spotify | Spotify | US | *A Metronome Sang Farewell* | A Metronome Sang Farewell | 1 | 0.00230689504759333608026087267 |
| 2018-09-01 | 2018-09-30 | Spotify | Spotify | US | *A Metronome Sang Farewell* | Good Drug | 1 | 0.00230689504759333608026087267 |
| 2018-09-01 | 2018-09-30 | Spotify | Spotify | US | *A Metronome Sang Farewell* | Frankly, Im | 3 | 0.01770687351709270624491065629 |
| 2018-09-01 | 2018-09-30 | Spotify | Spotify | US | *A Metronome Sang Farewell* | We Don't Give A What | 51 | 0.30104849790576000163481115704 |
| 2018-09-01 | 2018-09-30 | Spotify | Spotify | US | *A Metronome Sang Farewell* | Quit Being Hard | 3 | 0.01770687351709270624491065629 |
| 2018-09-01 | 2018-09-30 | Spotify | Spotify | US | *A Metronome Sang Farewell* | Verde, Off Beat | 3 | 0.01770687351709270624491065629 |
| 2018-09-01 | 2018-09-30 | Spotify | Spotify | US | *A Metronome Sang Farewell* | Lets Be Famous | 5 | 0.02951455861821177074851093383 |
| 2018-09-01 | 2018-09-30 | Spotify | Spotify | US | *A Metronome Sang Farewell* | Vanity | 4 | 0.02361164689456941659868087506 |
| 2018-09-01 | 2018-09-30 | Spotify | Spotify | US | *A Metronome Sang Farewell* | Xeno Cowboy | 5 | 0.02951455861821177074851093383 |
| 2018-09-01 | 2018-09-30 | Spotify | Spotify | US | *A Metronome Sang Farewell* | A Metronome Sang Farewell | 9 | 0.05312620551278118734731190889 |
| 2018-09-01 | 2018-09-30 | Spotify | Spotify | US | *A Metronome Sang Farewell* | Good Drug | 6 | 0.03541747034185412489821312 60 |
| 2018-09-01 | 2018-09-30 | Spotify | Spotify | US | *A Metronome Sang Farewell* | Morale, An Intro For An Outro | 5 | 0.02951455861821177074851093383 |
| 2018-09-01 | 2018-09-30 | Spotify | Spotify | US | *A Metronome Sang Farewell* | More Than You Can | 5 | 0.02951455861821177074851093383 |
| 2018-09-01 | 2018-09-30 | Spotify | Spotify | US | Breaking News (Directors Cut) | Breaking News (Directors Cut) | 3 | 0.01770687351709270624491065629 |
| 2018-09-01 | 2018-09-30 | Spotify | Spotify | US | *A Metronome Sang Farewell* | Take Another Sniff | 3 | 0.01770687351709270624491065629 |
| 2018-09-01 | 2018-09-30 | Spotify | Spotify | US | *A Metronome Sang Farewell* | Zenith | 7 | 0.04132038206549647904791531 35 |
| 2018-09-01 | 2018-09-30 | Spotify | Spotify | US | *A Metronome Sang Farewell* | Breaking News | 3 | 0.01770687351709270624491065629 |
| 2018-09-01 | 2018-09-30 | Spotify | Spotify | US | *A Metronome Sang Farewell* | Tramp | 3 | 0.01770687351709270624491065629 |
| 2018-09-01 | 2018-09-30 | Spotify | Spotify | US | *A Metronome Sang Farewell* | I Do, Take Me Higher | 2 | 0.01180582344728470829940 43754 |
| 2018-09-01 | 2018-09-30 | Spotify | Spotify | US | *A Metronome Sang Farewell* | Why Do You Try | 4 | 0.02361164689456941659868087506 |
| 2018-10-01 | 2018-10-31 | Spotify | Spotify | CH | *A Metronome Sang Farewell* | A Metronome Sang Farewell | 1 | 0.00347776190490752491960887 50 |
| 2018-10-01 | 2018-10-31 | Spotify | Spotify | US | *A Metronome Sang Farewell* | Morale, An Intro For An Outro | 1 | 0.00245336082932423417036903 31 |
| 2018-10-01 | 2018-10-31 | Spotify | Spotify | US | *A Metronome Sang Farewell* | More Than You Can | 1 | 0.00245336082932423417036903 31 |
| 2018-10-01 | 2018-10-31 | Spotify | Spotify | US | *A Metronome Sang Farewell* | A Metronome Sang Farewell | 1 | 0.00314981346348400610274153 36 |
| 2018-10-01 | 2018-10-31 | Spotify | Spotify | US | *A Metronome Sang Farewell* | We Don't Give A What | 22 | 0.12755032351640860390851709 18 |
| 2018-10-01 | 2018-10-31 | Spotify | Spotify | US | *A Metronome Sang Farewell* | Quit Being Hard | 1 | 0.00579774197797311835947807 92 |
| 2018-10-01 | 2018-10-31 | Spotify | Spotify | US | *A Metronome Sang Farewell* | Verde, Off Beat | 1 | 0.00579774197797311835947807 92 |
| 2018-10-01 | 2018-10-31 | Spotify | Spotify | US | *A Metronome Sang Farewell* | Zenith | 2 | 0.01159548395594623671695609 83 |

New Release

# Trends

All time ⌄

⊞ Overview

◉ My releases

Audience     Tracks     **Streaming Services**

⤢ Stats

Trends

# Streams                                **Downloads**

Earnings          Spotify              351

📱 My money



No downloads data

## Montreal

160 St. Viateur East #809

Montreal, Quebec,
Canada, H2T 1A8

## Los Angeles

1271 N Clark Street

Hollywood Hills, Los
Angeles

CA, 90069 USA

## Berlin

Schönhauser Allee 99

10439 Berlin

*LandR address*

# We are hiring

Leave your mark on the music industry.

See open positions

Title 15 USC

THE FEDERAL TRADE COMMISSION WILL RESUME NORMAL BUSINESS HOURS ON MON., JAN. 28.

FTC online services and website updates will resume during business hours on Monday, January 28, 2019.



# FEDERAL TRADE COMMISSION
PROTECTING AMERICA'S CONSUMERS

# The Antitrust Laws

Congress passed the first antitrust law, the Sherman Act, in 1890 as a "comprehensive charter of economic liberty aimed at preserving free and unfettered competition as the rule of trade." In 1914, Congress passed two additional antitrust laws: the Federal Trade Commission Act, which created the FTC, and the Clayton Act. With some revisions, these are the three core federal antitrust laws still in effect today.

The antitrust laws proscribe unlawful mergers and business practices in general terms, leaving courts to decide which ones are illegal based on the facts of each case. Courts have applied the antitrust laws to changing markets, from a time of horse and buggies to the present digital age. Yet for over 100 years, the antitrust laws have had the same basic objective: to protect the process of competition for the benefit of consumers, making sure there are strong incentives for businesses to operate efficiently, keep prices down, and keep quality up.

Here is an overview of the three core federal antitrust laws.

The Sherman Act outlaws "every contract, combination, or conspiracy in restraint of trade," and any "monopolization, attempted monopolization, or conspiracy or combination to monopolize." Long ago, the Supreme Court decided that the Sherman Act does not prohibit *every* restraint of trade, only those that are *unreasonable*. For instance, in some sense, an agreement between two individuals to form a partnership restrains trade, but may not do so unreasonably, and thus may be lawful under the antitrust laws. On the other hand, certain acts are considered so harmful to competition that they are almost always illegal. These include plain arrangements among competing individuals or businesses to fix prices, divide markets, or rig bids. These acts are "*per se*" violations of the Sherman Act; in other words, no defense or justification is allowed.

The penalties for violating the Sherman Act can be severe. Although most enforcement actions are civil, the Sherman Act is also a criminal law, and individuals and businesses that violate it may be prosecuted by the Department of Justice. Criminal prosecutions are typically limited to intentional and clear violations such as when competitors fix prices or rig bids. The Sherman Act imposes criminal penalties of up to $100 million for a corporation and $1 million for an individual, along with up to 10 years in prison. Under federal law, the maximum fine may be increased to twice the amount the conspirators gained from the illegal acts or twice the money lost by the victims of the crime, if either of those amounts is over $100 million.

The Federal Trade Commission Act bans "unfair methods of competition" and "unfair or deceptive acts or practices." The Supreme Court has said that all violations of the Sherman Act also violate the FTC Act. Thus, although the FTC does not technically enforce the Sherman Act, it can bring cases under the FTC Act against the same kinds of

activities that violate the Sherman Act. The FTC Act also reaches other practices that harm competition, but that may not fit neatly into categories of conduct formally prohibited by the Sherman Act. Only the FTC brings cases under the FTC Act.

The Clayton Act addresses specific practices that the Sherman Act does not clearly prohibit, such as mergers and interlocking directorates (that is, the same person making business decisions for competing companies). Section 7 of the Clayton Act prohibits mergers and acquisitions where the effect "may be substantially to lessen competition, or to tend to create a monopoly." As amended by the Robinson-Patman Act of 1936, the Clayton Act also bans certain discriminatory prices, services, and allowances in dealings between merchants. The Clayton Act was amended again in 1976 by the Hart-Scott-Rodino Antitrust Improvements Act to require companies planning large mergers or acquisitions to notify the government of their plans in advance. The Clayton Act also authorizes private parties to sue for triple damages when they have been harmed by conduct that violates either the Sherman or Clayton Act and to obtain a court order prohibiting the anticompetitive practice in the future.

In addition to these federal statutes, most states have antitrust laws that are enforced by state attorneys general or private plaintiffs. Many of these statutes are based on the federal antitrust laws.



ftc.gov

CRDRAct of
2004

Public Law 108–419
108th Congress

## An Act

To amend title 17, United States Code, to replace copyright arbitration royalty panels with Copyright Royalty Judges, and for other purposes.

Nov. 30, 2004
[H.R. 1417]

Copyright
Royalty and
Distribution
Reform Act of
2004.
17 USC 101 note.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

**SECTION 1. SHORT TITLE.**

This Act may be cited as the "Copyright Royalty and Distribution Reform Act of 2004".

**SEC. 2. REFERENCE.**

Except as otherwise expressly provided, whenever in this Act an amendment or repeal is expressed in terms of an amendment to, or repeal of, a section or other provision, the reference shall be considered to be made to a section or other provision of title 17, United States Code.

**SEC. 3. COPYRIGHT ROYALTY JUDGE AND STAFF.**

(a) IN GENERAL.—Chapter 8 is amended to read as follows:

## "CHAPTER 8—PROCEEDINGS BY COPYRIGHT ROYALTY JUDGES

"Sec.
"801. Copyright Royalty Judges; appointment and functions.
"802. Copyright Royalty Judgeships; staff.
"803. Proceedings of Copyright Royalty Judges.
"804. Institution of proceedings.
"805. General rule for voluntarily negotiated agreements.

### "§ 801. Copyright Royalty Judges; appointment and functions

"(a) APPOINTMENT.—The Librarian of Congress shall appoint 3 full-time Copyright Royalty Judges, and shall appoint 1 of the 3 as the Chief Copyright Royalty Judge. The Librarian shall make appointments to such positions after consultation with the Register of Copyrights.

"(b) FUNCTIONS.—Subject to the provisions of this chapter, the functions of the Copyright Royalty Judges shall be as follows:

"(1) To make determinations and adjustments of reasonable terms and rates of royalty payments as provided in sections 112(e), 114, 115, 116, 118, 119 and 1004. The rates applicable under sections 114(f)(1)(B), 115, and 116 shall be calculated to achieve the following objectives:

"(A) To maximize the availability of creative works to the public.

"(B) To afford the copyright owner a fair return for his or her creative work and the copyright user a fair income under existing economic conditions.

"(C) To reflect the relative roles of the copyright owner and the copyright user in the product made available to the public with respect to relative creative contribution, technological contribution, capital investment, cost, risk, and contribution to the opening of new markets for creative expression and media for their communication.

"(D) To minimize any disruptive impact on the structure of the industries involved and on generally prevailing industry practices.

"(2) To make determinations concerning the adjustment of the copyright royalty rates under section 111 solely in accordance with the following provisions:

"(A) The rates established by section 111(d)(1)(B) may be adjusted to reflect—

"(i) national monetary inflation or deflation; or

"(ii) changes in the average rates charged cable subscribers for the basic service of providing secondary transmissions to maintain the real constant dollar level of the royalty fee per subscriber which existed as of the date of October 19, 1976,

except that—

"(I) if the average rates charged cable system subscribers for the basic service of providing secondary transmissions are changed so that the average rates exceed national monetary inflation, no change in the rates established by section 111(d)(1)(B) shall be permitted; and

"(II) no increase in the royalty fee shall be permitted based on any reduction in the average number of distant signal equivalents per subscriber.

The Copyright Royalty Judges may consider all factors relating to the maintenance of such level of payments, including, as an extenuating factor, whether the industry has been restrained by subscriber rate regulating authorities from increasing the rates for the basic service of providing secondary transmissions.

"(B) In the event that the rules and regulations of the Federal Communications Commission are amended at any time after April 15, 1976, to permit the carriage by cable systems of additional television broadcast signals beyond the local service area of the primary transmitters of such signals, the royalty rates established by section 111(d)(1)(B) may be adjusted to ensure that the rates for the additional distant signal equivalents resulting from such carriage are reasonable in the light of the changes effected by the amendment to such rules and regulations. In determining the reasonableness of rates proposed following an amendment of Federal Communications Commission rules and regulations, the Copyright Royalty Judges shall consider, among other factors, the economic impact on copyright owners and users; except that no adjustment in royalty rates shall be made under this subparagraph with respect to any distant signal equivalent or fraction thereof represented by—

CFR Title 37

Subchapter D
_____

370.1 — 370.5

# SUBCHAPTER D—NOTICE AND RECORDKEEPING REQUIREMENTS FOR STATUTORY LICENSES

## PART 370—NOTICE AND RECORD-KEEPING REQUIREMENTS FOR STATUTORY LICENSES

Sec.
370.1 General definitions.
370.2 Notice of use of sound recordings under statutory license.
370.3 Reports of use of sound recordings under statutory license for preexisting subscription services.
370.4 Reports of use of sound recordings under statutory license for nonsubscription transmission services, preexisting satellite digital audio radio services, new subscription services and business establishment services.
370.5 Designated collection and distribution organizations for reports of use of sound recordings under statutory license.

AUTHORITY: 17 U.S.C. 112(e)(4), 114(f)(4)(A).

SOURCE: 74 FR 52423, Oct. 13, 2009, unless otherwise noted.

### §370.1 General definitions.

For purposes of this part, the following definitions apply:

(a) A *Notice of Use of Sound Recordings Under Statutory License* is a written notice to sound recording copyright owners of the use of their works under section 112(e) or 114(d)(2) of title 17, United States Code, or both, and is required under this part to be filed by a Service in the Copyright Office.

(b) A *Service* is an entity engaged in either the digital transmission of sound recordings pursuant to section 114(d)(2) of title 17 of the United States Code or making ephemeral phonorecords of sound recordings pursuant to section 112(e) of title 17 of the United States Code or both. The definition of a Service includes an entity that transmits an AM/FM broadcast signal over a digital communications network such as the Internet, regardless of whether the transmission is made by the broadcaster that originates the AM/FM signal or by a third party, provided that such transmission meets the applicable requirements of the statutory license set forth in 17 U.S.C. 114(d)(2). A Service may be further characterized as either a pre-existing subscription service, pre-existing satellite digital audio radio service, nonsubscription transmission service, new subscription service, business establishment service or a combination of those.

(c) A *Preexisting Subscription Service* is defined in 17 U.S.C. 114(j)(11).

(d) A *New Subscription Service* is defined in 17 U.S.C. 114(j)(8).

(e) A *Nonsubscription Transmission Service* is a service that makes noninteractive nonsubscription digital audio transmissions that are not exempt under section 114(d)(1) of title 17 of the United States Code and are made as part of a service that provides audio programming consisting, in whole or in part, of performances of sound recordings, including transmissions of broadcast transmissions, if the primary purpose of the service is to provide to the public such audio or other entertainment programming, and the primary purpose of the service is not to sell, advertise, or promote particular products or services other than sound recordings, live concerts, or other music-related events.

(f) A *Preexisting Satellite Digital Audio Radio Service* is defined in 17 U.S.C. 114(j)(10).

(g) A *Business Establishment Service* is a service that makes ephemeral phonorecords of sound recordings pursuant to section 112(e) of title 17 of the United States Code and is exempt under section 114(d)(1)(C)(iv) of title 17 of the United States Code.

(h) A *Collective* is a collection and distribution organization that is designated under one or both of the statutory licenses by determination of the Copyright Royalty Judges.

(i) A *Report of Use* is a report required to be provided by a Service that is transmitting sound recordings pursuant to the statutory license set forth in section 114(d)(2) of title 17 of the United States Code or making ephemeral phonorecords of sound recordings pursuant to the statutory license set forth in section 112(e) of title 17 of the United States Code, or both.

**§ 370.2  Notice of use of sound recordings under statutory license.**

(a) *General.* This section prescribes rules under which copyright owners shall receive notice of use of their sound recordings when used under either section 112(e) or 114(d)(2) of title 17, United States Code, or both.

(b) *Forms and content.* A Notice of Use of Sound Recordings Under Statutory License shall be prepared on a form that may be obtained from the Copyright Office Web site or from the Licensing Division, and shall include the following information:

(1) The full legal name of the Service that is either commencing digital transmissions of sound recordings or making ephemeral phonorecords of sound recordings under statutory license or doing both.

(2) The full address, including a specific number and street name or rural route, of the place of business of the Service. A post office box or similar designation will not be sufficient except where it is the only address that can be used in that geographic location.

(3) The telephone number and facsimile number of the Service.

(4) Information on how to gain access to the online Web site or homepage of the Service, or where information may be posted under this section concerning the use of sound recordings under statutory license.

(5) Identification of each license under which the Service intends to operate, including identification of each of the following categories under which the Service will be making digital transmissions of sound recordings: Pre-existing subscription service, pre-existing satellite digital audio radio service, nonsubscription transmission service, new subscription service or business establishment service.

(6) The date or expected date of the initial digital transmission of a sound recording to be made under the section 114 statutory license and/or the date or the expected date of the initial use of the section 112(e) license for the purpose of making ephemeral phonorecords of the sound recordings.

(7) Identification of any amendments required by paragraph (e) of this section.

(c) *Signature.* The Notice shall include the signature of the appropriate officer or representative of the Service that is either transmitting the sound recordings or making ephemeral phonorecords of sound recordings under statutory license or doing both. The signature shall be accompanied by the printed or typewritten name and the title of the person signing the Notice and by the date of the signature.

(d) *Filing notices; fees.* The original and three copies shall be filed with the Licensing Division of the Copyright Office and shall be accompanied by the filing fee set forth in § 201.3(e) of this title. Notices shall be placed in the public records of the Licensing Division. The Notice and filing fee shall be sent to the Licensing Division at either the address listed on the form obtained from the Copyright Office or to: Library of Congress, Copyright Office, Licensing Division, 101 Independence Avenue, SE., Washington, DC 20557–6400. A Service that, on or after July 1, 2004, shall make digital transmissions of ephemeral phonorecords of sound recordings under statutory license shall file a Notice of Use of Sound Recordings under Statutory License with the Licensing Division of the Copyright Office prior to the making of the first ephemeral phonorecord of the sound recording and prior to the first digital transmission of the sound recording.

(e) *Amendment.* A Service shall file a new Notice of Use of Sound Recordings under Statutory License within 45 days after any of the information contained in the Notice on file has changed, and shall indicate in the space provided by the Copyright Office that the Notice is an amended filing. The Licensing Division shall retain copies of all prior Notices filed by the Service.

**§ 370.3  Reports of use of sound recordings under statutory license for pre-existing subscription services.**

(a) *General.* This section prescribes the rules for the maintenance and delivery of reports of use for sound recordings under section 112(e) or section 114(d)(2) of title 17 of the United States Code, or both, by preexisting subscription services.

(b) *Delivery.* Reports of Use shall be delivered to Collectives that are identified in the records of the Licensing Division of the Copyright Office as having been designated by determination of the Copyright Royalty Judges. Reports of Use shall be delivered on or before the forty-fifth day after the close of each month.

(c) *Posting.* In the event that no Collective is designated under the statutory license, or if all designated Collectives have terminated collection and distribution operations, a preexisting subscription service transmitting sound recordings under statutory license shall post and make available online its Reports of Use. Preexisting subscription services shall post their Reports of Use online on or before the forty-fifth day after the close of each month, and continue to make them available thereafter to all sound recording copyright owners for a period of 90 days. Preexisting subscription services may require use of passwords for access to posted Reports of Use, but must make passwords available in a timely manner and free of charge or other restrictions. Preexisting subscription services may predicate provision of a password upon:

(1) Information relating to identity, location and status as a sound recording copyright owner; and

(2) A "click-wrap" agreement not to use information in the Report of Use for purposes other than royalty collection, royalty distribution, and determining compliance with statutory license requirements, without the express consent of the preexisting subscription service providing the Report of Use.

(d) *Content.* A "Report of Use of Sound Recordings under Statutory License" shall be identified as such by prominent caption or heading, and shall include a preexisting subscription service's "Intended Playlists" for each channel and each day of the reported month. The "Intended Playlists" shall include a consecutive listing of every recording scheduled to be transmitted, and shall contain the following information in the following order:

(1) The name of the preexisting subscription service or entity;

(2) The channel;

(3) The sound recording title;

(4) The featured recording artist, group, or orchestra;

(5) The retail album title (or, in the case of compilation albums created for commercial purposes, the name of the retail album identified by the preexisting subscription service for purchase of the sound recording);

(6) The marketing label of the commercially available album or other product on which the sound recording is found;

(7) The catalog number;

(8) The International Standard Recording Code (ISRC) embedded in the sound recording, where available and feasible;

(9) Where available, the copyright owner information provided in the copyright notice on the retail album or other product (*e.g.,* following the symbol (P), that is the letter P in a circle) or, in the case of compilation albums created for commercial purposes, in the copyright notice for the individual sound recording;

(10) The date of transmission; and

(11) The time of transmission.

(e) *Signature.* Reports of Use shall include a signed statement by the appropriate officer or representative of the preexisting subscription service attesting, under penalty of perjury, that the information contained in the Report is believed to be accurate and is maintained by the preexisting subscription service in its ordinary course of business. The signature shall be accompanied by the printed or typewritten name and title of the person signing the Report, and by the date of signature.

(f) *Format.* Reports of Use should be provided on a standard machine-readable medium, such as diskette, optical disc, or magneto-optical disc, and should conform as closely as possible to the following specifications:

(1) ASCII delimited format, using pipe characters as delimiter, with no headers or footers;

(2) Carats should surround strings;

(3) No carats should surround dates and numbers;

(4) Dates should be indicated by: YYYY/MM/DD;

(5) Times should be based on a 24-hour clock: HH:MM:SS;

(6) A carriage return should be at the end of each line; and

(7) All data for one record should be on a single line.

(g) *Confidentiality.* Copyright owners, their agents and Collectives shall not disseminate information in the Reports of Use to any persons not entitled to it, nor utilize the information for purposes other than royalty collection and distribution, and determining compliance with statutory license requirements, without express consent of the preexisting subscription service providing the Report of Use.

(h) *Documentation.* All compulsory licensees shall, for a period of at least three years from the date of service or posting of the Report of Use, keep and retain a copy of the Report of Use.

§ 370.4 **Reports of use of sound recordings under statutory license for nonsubscription transmission services, preexisting satellite digital audio radio services, new subscription services and business establishment services.**

(a) *General.* This section prescribes rules for the maintenance and delivery of reports of use of sound recordings under section 112(e) or section 114(d)(2) of title 17 of the United States Code, or both, by nonsubscription transmission services, preexisting satellite digital audio radio services, new subscription services, and business establishment services.

(b) *Definitions.* (1) *Aggregate Tuning Hours* are the total hours of programming that a nonsubscription transmission service, preexisting satellite digital audio radio service, new subscription service or business establishment service has transmitted during the reporting period identified in paragraph (d)(3) of this section to all listeners within the United States over the relevant channels or stations, and from any archived programs, that provide audio programming consisting, in whole or in part, of eligible nonsubscription service, preexisting satellite digital audio radio service, new subscription service or business establishment service transmissions, less the actual running time of any sound recordings for which the service has obtained direct licenses apart from 17 U.S.C. 114(d)(2) or which do not require

a license under United States copyright law. For example, if a nonsubscription transmission service transmitted one hour of programming to 10 simultaneous listeners, the nonsubscription transmission service's Aggregate Tuning Hours would equal 10. If 3 minutes of that hour consisted of transmission of a directly licensed recording, the nonsubscription transmission service's Aggregate Tuning Hours would equal 9 hours and 30 minutes. If one listener listened to the transmission of a nonsubscription transmission service for 10 hours (and none of the recordings transmitted during that time was directly licensed), the nonsubscription transmission service's Aggregate Tuning Hours would equal 10.

(2) An *AM/FM Webcast* is a transmission made by an entity that transmits an AM/FM broadcast signal over a digital communications network such as the Internet, regardless of whether the transmission is made by the broadcaster that originates the AM/FM signal or by a third party, provided that such transmission meets the applicable requirements of the statutory license set forth in 17 U.S.C. 114(d)(2).

(3) A *minimum fee broadcaster* is a nonsubscription service that meets the definition of a broadcaster pursuant to § 380.2(b) of this chapter and the service's payments for eligible transmissions do not exceed the annual minimum fee established for licensees relying upon the statutory licenses set forth in 17 U.S.C. 112 and 114.

(4) A *performance* is each instance in which any portion of a sound recording is publicly performed to a Listener by means of a digital audio transmission or retransmission (*e.g.*, the delivery of any portion of a single track from a compact disc to one Listener) but excluding the following:

(i) A performance of a sound recording that does not require a license (*e.g.*, the sound recording is not copyrighted);

(ii) A performance of a sound recording for which the service has previously obtained a license from the Copyright Owner of such sound recording; and

(iii) An incidental performance that both:

(A) Makes no more than incidental use of sound recordings including, but not limited to, brief musical transitions in and out of commercials or program segments, brief performances during news, talk and sports programming, brief background performances during disk jockey announcements, brief performances during commercials of sixty seconds or less in duration, or brief performances during sporting or other public events; and

(B) Other than ambient music that is background at a public event, does not contain an entire sound recording and does not feature a particular sound recording of more than thirty seconds (as in the case of a sound recording used as a theme song).

(5) *Play frequency* is the number of times a sound recording is publicly performed by a Service during the relevant period, without respect to the number of listeners receiving the sound recording. If a particular sound recording is transmitted to listeners on a particular channel or program only once during the reporting period, then the play frequency is one. If the sound recording is transmitted 10 times during the reporting period, then the play frequency is 10.

(c) *Delivery.* Reports of Use shall be delivered to Collectives that are identified in the records of the Licensing Division of the Copyright Office as having been designated by determination of the Copyright Royalty Judges. Reports of Use shall be delivered on or before the forty-fifth day after the close of each reporting period identified in paragraph (d)(3) of this section.

(d) *Report of Use.* (1) *Separate reports not required.* A nonsubscription transmission service, preexisting satellite digital audio radio service or a new subscription service that transmits sound recordings pursuant to the statutory license set forth in section 114(d)(2) of title 17 of the United States Code and makes ephemeral phonorecords of sound recordings pursuant to the statutory license set forth in section 112(e) of title 17 of the United States Code need not maintain a separate Report of Use for each statutory license during the relevant reporting periods.

(2) *Content.* For a nonsubscription transmission service, preexisting satellite digital audio radio service, new subscription service or business establishment service that transmits sound recordings pursuant to the statutory license set forth in section 114(d)(2) of title 17 of the United States Code, or the statutory license set forth in section 112(e) of title 17 of the United States Code, or both, each Report of Use shall contain the following information, in the following order, for each sound recording transmitted during the reporting periods identified in paragraph (d)(3) of this section:

(i) The name of the nonsubscription transmission service, preexisting satellite digital audio radio service, new subscription service or business establishment service making the transmissions, including the name of the entity filing the Report of Use, if different;

(ii) The category transmission code for the category of transmission operated by the nonsubscription transmission service, preexisting satellite digital audio radio service, new subscription service or business establishment service:

(A) For eligible nonsubscription transmissions other than broadcast simulcasts and transmissions of non-music programming;

(B) For eligible nonsubscription transmissions of broadcast simulcast programming not reasonably classified as news, talk, sports or business programming;

(C) For eligible nonsubscription transmissions of non-music programming reasonably classified as news, talk, sports or business programming;

(D)—(G) [Reserved]

(H) For transmissions other than broadcast simulcasts and transmissions of non-music programming made by an eligible new subscription service;

(I) For transmissions of broadcast simulcast programming not reasonably classified as news, talk, sports or business programming made by an eligible new subscription service;

(J) For transmissions of non-music programming reasonably classified as

news, talk, sports or business programming made by an eligible new subscription service; and

(K) For eligible transmissions by a business establishment service making ephemeral recordings;

(iii) The featured artist;

(iv) The sound recording title;

(v) The International Standard Recording Code (ISRC) or, alternatively to the ISRC, the:

(A) Album title; and

(B) Marketing label;

(vi) For a nonsubscription transmission service except those qualifying as minimum fee broadcasters: The actual total performances of the sound recording during the reporting period.

(vii) For a preexisting satellite digital audio radio service, a new subscription service, a business establishment service or a nonsubscription service qualifying as a minimum fee broadcaster: The actual total performances of the sound recording during the reporting period or, alternatively, the

(A) Aggregate Tuning Hours;

(B) Channel or program name; and

(C) Play frequency.

(3) *Reporting period.* A Report of Use shall be prepared:

(i) For each calendar month of the year by all services other than a nonsubscription service qualifying as a minimum fee broadcaster; or

(ii) For a two-week period (two periods of 7 consecutive days) for each calendar quarter of the year by a nonsubscription service qualifying as a minimum fee broadcaster and the two-week period need not consist of consecutive weeks, but both weeks must be completely within the calendar quarter.

(4) *Signature.* Reports of Use shall include a signed statement by the appropriate officer or representative of the service attesting, under penalty of perjury, that the information contained in the Report is believed to be accurate and is maintained by the service in its ordinary course of business. The signature shall be accompanied by the printed or typewritten name and the title of the person signing the Report, and by the date of the signature.

(5) *Confidentiality.* Copyright owners, their agents and Collectives shall not disseminate information in the Reports of Use to any persons not entitled to it, nor utilize the information for purposes other than royalty collection and distribution, without consent of the service providing the Report of Use.

(6) *Documentation.* A Service shall, for a period of at least three years from the date of service or posting of a Report of Use, keep and retain a copy of the Report of Use.

(e) *Format and delivery.* (1) *Electronic format only.* Reports of use must be maintained and delivered in electronic format only, as prescribed in paragraphs (e)(2) through (8) of this section. A hard copy report of use is not permissible.

(2) *ASCII text file delivery; facilitation by provision of spreadsheet templates.* All report of use data files must be delivered in ASCII format. However, to facilitate such delivery, SoundExchange shall post and maintain on its Internet Web site a template for creating a report of use using Microsoft's Excel spreadsheet and Corel's Quattro Pro spreadsheet and instruction on how to convert such spreadsheets to ASCII text files that conform to the format specifications set forth below. Further, technical support and cost associated with the use of spreadsheets is the responsibility of the service submitting the report of use.

(3) *Delivery mechanism.* The data contained in a report of use may be delivered by File Transfer Protocol (FTP), e-mail, or CD–ROM according to the following specifications:

(i) A service delivering a report of use via FTP must obtain a username, password and delivery instructions from SoundExchange. SoundExchange shall maintain on a publicly available portion of its Web site instructions for applying for a username, password and delivery instructions. SoundExchange shall have 15 days from date of request to respond with a username, password and delivery instructions.

(ii) A service delivering a report of use via e-mail shall append the report as an attachment to the e-mail. The main body of the e-mail shall identify:

(A) The full name and address of the service;

(B) The contact person's name, telephone number and e-mail address;

(C) The start and end date of the reporting period;

(D) The number of rows in the data file. If the report of use is a file using headers, counting of the rows should begin with row 15. If the report of use is a file without headers, counting of the rows should begin with row 1; and

(E) The name of the file attached.

(iii) A service delivering a report of use via CD–ROM must compress the reporting data to fit onto a single CD–ROM per reporting period. Each CD–ROM shall be submitted with a cover letter identifying:

(A) The full name and address of the service;

(B) The contact person's name, telephone number and e-mail address;

(C) The start and end date of the reporting period;

(D) The number of rows in the data file. If the report of use is a file using headers, counting of the rows should begin with row 15. If the report of use is a file without headers, counting of the rows should begin with row 1; and

(E) The name of the file attached.

(4) *Delivery address.* Reports of use shall be delivered to SoundExchange at the following address: SoundExchange, Inc., 1121 14th Street, NW., Suite 700, Washington, DC 20005; (Phone) (202) 640-5858; (Facsimile) (202) 640–5859; (E-mail) *reports@soundexchange.com.*

SoundExchange shall forward electronic copies of these reports of use to all other collectives defined in this section.

(5) *File naming.* Each data file contained in a report of use must be given a name by the service followed by the start and end date of the reporting period. The start and end date must be separated by a dash and in the format of year, month, and day (YYYYMMDD). Each file name must end with the file type extension of ".txt". (*Example:* AcmeMusicCo20050101–20050331.txt).

(6) *File type and compression.* (i) All data files must be in ASCII format.

(ii) A report of use must be compressed in one of the following zipped formats:

(A) .zip—generated using utilities such as WinZip and/or UNIX zip command;

(B) .Z—generated using UNIX compress command; or

(C) .gz—generated using UNIX gzip command.

(iii) Zipped files shall be named in the same fashion as described in paragraph (e)(5) of this section, except that such zipped files shall use the applicable file extension compression name described in this paragraph (e)(6).

(7) *Files with headers.* (i) If a service elects to submit files with headers, the following elements, in order, must occupy the first 14 rows of a report of use:

(A) Name of service;

(B) Name of contact person;

(C) Street address of the service;

(D) City, state and zip code of the service;

(E) Telephone number of the contact person;

(F) E-mail address of the contact person;

(G) Start of the reporting period (YYYYMMDD);

(H) End of the reporting period (YYYYMMDD);

(I) Report generation date (YYYYMMDD);

(J) Number of rows in data file, beginning with 15th row;

(K) Text indicator character;

(L) Field delimiter character;

(M) Blank line; and

(N) Report headers (Featured Artist, Sound Recording Title, etc.).

(ii) Each of the rows described in paragraphs (e)(7)(i)(A) through (F) of this section must not exceed 255 alphanumeric characters. Each of the rows described in paragraphs (e)(7)(i)(G) through (I) of this section should not exceed eight alphanumeric characters.

(iii) Data text fields, as required by paragraph (d) of this section, begin on row 15 of a report of use with headers. A carriage return must be at the end of each row thereafter. Abbreviations within data fields are not permitted.

(iv) The text indicator character must be unique and must never be found in the report's data content.

(v) The field delimiter character must be unique and must never be found in the report's data content. Delimiters must be used even when certain elements are not being reported; in such case, the service must denote the blank data field with a delimiter in

the order in which it would have appeared.

(8) *Files without headers.* If a service elects to submit files without headers, the following format requirements must be met:

(i) ASCII delimited format, using pipe (|) characters as delimiters, with no headers or footers;

(ii) Carats (^) should surround strings;

(iii) No carats (^) should surround dates and numbers;

(iv) A carriage return must be at the end of each line;

(v) All data for one record must be on a single line; and

(vi) Abbreviations within data fields are not permitted.

**§ 370.5 Designated collection and distribution organizations for reports of use of sound recordings under statutory license.**

(a) *General.* This section prescribes rules under which reports of use shall be collected and distributed under section 114(f) of title 17 of the United States Code, and under which reports of such use shall be kept and made available.

(b) *Notice of Designation as Collective under Statutory License.* A Collective shall file with the Licensing Division of the Copyright Office and post and make available online a "Notice of Designation as Collective under Statutory License," which shall be identified as such by prominent caption or heading, and shall contain the following information:

(1) The Collective name, address, telephone number and facsimile number;

(2) A statement that the Collective has been designated for collection and distribution of performance royalties under statutory license for digital transmission of sound recordings; and

(3) Information on how to gain access to the online Web site or home page of the Collective, where information may be posted under this part concerning the use of sound recordings under statutory license. The address of the Licensing Division is: Library of Congress, Copyright Office, Licensing Division, 101 Independence Avenue, SE., Washington, DC 20557–6400.

(c) *Annual Report.* The Collective will post and make available online, for the duration of one year, an Annual Report on how the Collective operates, how royalties are collected and distributed, and what the Collective spent that fiscal year on administrative expenses.

(d) *Inspection of Reports of Use by copyright owners.* The Collective shall make copies of the Reports of Use for the preceding three years available for inspection by any sound recording copyright owner, without charge, during normal office hours upon reasonable notice. The Collective shall predicate inspection of Reports of Use upon information relating to identity, location and status as a sound recording copyright owner, and the copyright owner's written agreement not to utilize the information for purposes other than royalty collection and distribution, and determining compliance with statutory license requirements, without express consent of the Service providing the Report of Use. The Collective shall render its best efforts to locate copyright owners in order to make available reports of use, and such efforts shall include searches in Copyright Office public records and published directories of sound recording copyright owners.

(e) *Confidentiality.* Copyright owners, their agents, and Collectives shall not disseminate information in the Reports of Use to any persons not entitled to it, nor utilize the information for purposes other than royalty collection and distribution, and determining compliance with statutory license requirements, without express consent of the Service providing the Report of Use.

(f) *Termination and dissolution.* If a Collective terminates its collection and distribution operations prior to the close of its term of designation, the Collective shall notify the Licensing Division of the Copyright Office, the Copyright Royalty Board and all Services transmitting sound recordings under statutory license, by certified or registered mail. The dissolving Collective shall provide each such Service with information identifying the copyright owners it has served.

CFR Title 37

Subchapter E
380 — 380.7
&
385.1 — 385.17

# SUBCHAPTER E—RATES AND TERMS FOR STATUTORY LICENSES

## PART 380—RATES AND TERMS FOR TRANSMISSIONS BY ELIGIBLE NONSUBSCRIPTION SERVICES AND NEW SUBSCRIPTION SERVICES AND FOR THE MAKING OF EPHEMERAL REPRODUCTIONS TO FACILITATE THOSE TRANSMISSIONS

### Subpart A—Regulations Of General Application

Sec.
380.1  Scope and compliance.
380.2  Making payment of royalty fees.
380.3  Delivering statements of account.
380.4  Distributing royalty fees.
380.5  Handling Confidential Information.
380.6  Auditing payments and distributions.
380.7  Definitions.

### Subpart B—Broadcasters

380.10  Royalty fees for the public performance of sound recordings and the making of ephemeral recordings.

### Subpart C—Noncommercial Educational Webcasters

380.20  General.
380.21  Definitions.
380.22  Royalty fees for the public performance of sound recordings and for ephemeral recordings.
380.23  Terms for making payment of royalty fees and statements of account.
380.24  Confidential Information.
380.25  Verification of royalty payments.
380.26  Verification of royalty distributions.
380.27  Unclaimed funds.

### Subpart D—Public Broadcasters

380.30  General.
380.31  Definitions.
380.32  Royalty fees for the public performance of sound recordings and for ephemeral recordings.
380.33  Terms for making payment of royalty fees and statements of account.
380.34  Confidential Information.
380.35  Verification of royalty payments.
380.36  Verification of royalty distributions.
380.37  Unclaimed funds.

AUTHORITY: 17 U.S.C. 112(e), 114(f), 804(b)(3).

SOURCE: 79 FR 23127, Apr. 25, 2014, unless otherwise noted.

## Subpart A—Regulations Of General Application

SOURCE: 81 FR 26406, May 2, 2016, unless otherwise noted.

### § 380.1  Scope and compliance.

(a) *Scope.* Subparts A and B of this part codify rates and terms of royalty payments for the public performance of sound recordings in certain digital transmissions by certain Licensees in accordance with the applicable provisions of 17 U.S.C. 114 and for the making of Ephemeral Recordings by those Licensees in accordance with the provisions of 17 U.S.C. 112(e), during the period January 1, 2016, through December 31, 2020.

(b) *Limited application of terms and definitions.* The terms and definitions in Subpart A apply only to Subpart B, except as expressly adopted and applied in subpart C or subpart D of this part.

(c) *Legal compliance.* Licensees relying upon the statutory licenses set forth in 17 U.S.C. 112(e) and 114 must comply with the requirements of this part 380 and any other applicable regulations.

(d) *Voluntary agreements.* Notwithstanding the royalty rates and terms established in any subparts of this part 380, the rates and terms of any license agreements entered into by Copyright Owners and Licensees may apply in lieu of these rates and terms.

### § 380.2  Making payment of royalty fees.

(a) *Payment to the Collective.* A Licensee must make the royalty payments due under subpart B to SoundExchange, Inc., which is the Collective designated by the Copyright Royalty Board to collect and distribute royalties under this part 380.

(b) *Monthly payments.* A Licensee must make royalty payments on a monthly basis. Payments are due on or before the 45th day after the end of the month in which the Licensee made Eligible Transmissions.

(c) *Minimum payments.* A Licensee must make any minimum annual payments due under Subpart B by January 31 of the applicable license year. A Licensee that as of January 31 of any year has not made any eligible nonsubscription transmissions, noninteractive digital audio transmissions as part of a new subscription service, or Ephemeral Recordings pursuant to the licenses in 17 U.S.C. 114 and/or 17 U.S.C. 112(e), but that begins making such transmissions after that date must make any payment due by the 45th day after the end of the month in which the Licensee commences making such transmissions.

(d) *Late fees.* A Licensee must pay a late fee for each payment and each Statement of Account that the Collective receives after the due date. The late fee is 1.5% (or the highest lawful rate, whichever is lower) of the late payment amount per month. The late fee for a late Statement of Account is 1.5% of the payment amount associated with the Statement of Account. Late fees accrue from the due date until the date that the Collective receives the late payment or late Statement of Account.

(1) *Waiver of late fees.* The Collective may waive or lower late fees for immaterial or inadvertent failures of a Licensee to make a timely payment or submit a timely Statement of Account.

(2) *Notice regarding noncompliant Statements of Account.* If it is reasonably evident to the Collective that a timely-provided Statement of Account is materially noncompliant, the Collective must notify the Licensee within 90 days of discovery of the noncompliance.

### §380.3 Delivering statements of account.

(a) *Statements of Account.* Any payment due under this Part 380 must be accompanied by a corresponding Statement of Account that must contain the following information:

(1) Such information as is necessary to calculate the accompanying royalty payment;

(2) The name, address, business title, telephone number, facsimile number (if any), electronic mail address (if any) and other contact information of the person to be contacted for information or questions concerning the content of the Statement of Account;

(3) The signature of:

(i) The Licensee or a duly authorized agent of Licensee;

(ii) A partner or delegate if the Licensee is a partnership; or

(iii) An officer of the corporation if the Licensee is a corporation.

(4) The printed or typewritten name of the person signing the Statement of Account;

(5) If the Licensee is a partnership or corporation, the title or official position held in the partnership or corporation by the person signing the Statement of Account;

(6) A certification of the capacity of the person signing;

(7) The date of signature; and

(8) An attestation to the following effect:

I, the undersigned owner/officer/partner/agent of the Licensee have examined this Statement of Account and hereby state that it is true, accurate, and complete to my knowledge after reasonable due diligence and that it fairly presents, in all material respects, the liabilities of the Licensee pursuant to 17 U.S.C. 112(e) and 114 and applicable regulations adopted under those sections.

(b) *Certification.* Licensee's Chief Financial Officer or, if Licensee does not have a Chief Financial Officer, a person authorized to sign Statements of Account for the Licensee must submit a signed certification on an annual basis attesting that Licensee's royalty statements for the prior year represent a true and accurate determination of the royalties due and that any method of allocation employed by Licensee was applied in good faith and in accordance with U.S. GAAP.

### §380.4 Distributing royalty fees.

(a) *Distribution of royalties.* (1) The Collective must promptly distribute royalties received from Licensees to Copyright Owners and Performers that are entitled thereto, or to their designated agents. The Collective shall only be responsible for making distributions to those who provide the Collective with information as is necessary to identify and pay the correct recipient. The Collective must distribute royalties on a basis that values

all performances by a Licensee equally based upon the information provided under the Reports of Use requirements for Licensees pursuant to § 370.4 of this chapter and this subpart.

(2) The Collective must use its best efforts to identify and locate copyright owners and featured artists in order to distribute royalties payable to them under § 112(e) or 114(d)(2) of title 17, United States Code, or both. Such efforts must include, but not be limited to, searches in Copyright Office public records and published directories of sound recording copyright owners.

(b) *Unclaimed funds.* If the Collective is unable to identify or locate a Copyright Owner or Performer who is entitled to receive a royalty distribution under this part 380, the Collective must retain the required payment in a segregated trust account for a period of three years from the date of the first distribution of royalties from the relevant payment by a Licensee. No claim to distribution shall be valid after the expiration of the three-year period. After expiration of this period, the Collective must handle unclaimed funds in accordance with applicable federal, state, or common law.

(c) *Retention of records.* Licensees and the Collective shall keep books and records relating to payments and distributions of royalties for a period of not less than the prior three calendar years.

(d) *Designation of the Collective.* (1) The Judges designate SoundExchange, Inc., as the Collective to receive Statements of Account and royalty payments from Licensees and to distribute royalty payments to each Copyright Owner and Performer (or their respective designated agents) entitled to receive royalties under 17 U.S.C. 112(e) or 114(g).

(2) If SoundExchange, Inc. should dissolve or cease to be governed by a board consisting of equal numbers of representatives of Copyright Owners and Performers, then it shall be replaced for the applicable royalty term by a successor Collective according to the following procedure:

(i) The nine Copyright Owner representatives and the nine Performer representatives on the SoundExchange board as of the last day preceding SoundExchange's cessation or dissolution shall vote by a majority to recommend that the Copyright Royalty Judges designate a successor and must file a petition with the Copyright Royalty Judges requesting that the Judges designate the named successor and setting forth the reasons therefor.

(ii) Within 30 days of receiving the petition, the Copyright Royalty Judges must issue an order designating the recommended Collective, unless the Judges find good cause not to make and publish the designation in the FEDERAL REGISTER.

### § 380.5 Handling Confidential Information.

(a) *Definition.* For purposes of this part 380, "Confidential Information" means the Statements of Account and any information contained therein, including the amount of royalty payments and the number of Performances, and any information pertaining to the Statements of Account reasonably designated as confidential by the party submitting the statement. Confidential Information does not include documents or information that at the time of delivery to the Collective is public knowledge. The party seeking information from the Collective based on a claim that the information sought is a matter of public knowledge shall have the burden of proving to the Collective that the requested information is in the public domain.

(b) *Use of Confidential Information.* The Collective may not use any Confidential Information for any purpose other than royalty collection and distribution and activities related directly thereto.

(c) *Disclosure of Confidential Information.* The Collective shall limit access to Confidential Information to:

(1) Those employees, agents, consultants, and independent contractors of the Collective, subject to an appropriate written confidentiality agreement, who are engaged in the collection and distribution of royalty payments hereunder and activities related directly thereto who require access to the Confidential Information for the purpose of performing their duties during the ordinary course of their work;

(2) A Qualified Auditor or outside counsel who is authorized to act on behalf of:

(i) The Collective with respect to verification of a Licensee's statement of account pursuant to this part 380; or

(ii) A Copyright Owner or Performer with respect to the verification of royalty distributions pursuant to this part 380;

(3) Copyright Owners and Performers, including their designated agents, whose works a Licensee used under the statutory licenses set forth in 17 U.S.C. 112(e) and 114 by the Licensee whose Confidential Information is being supplied, subject to an appropriate written confidentiality agreement, and including those employees, agents, consultants, and independent contractors of such Copyright Owners and Performers and their designated agents, subject to an appropriate written confidentiality agreement, who require access to the Confidential Information to perform their duties during the ordinary course of their work;

(4) Attorneys and other authorized agents of parties to proceedings under 17 U.S.C. 8, 112, 114, acting under an appropriate protective order.

(d) *Safeguarding Confidential Information.* The Collective and any person authorized to receive Confidential Information from the Collective must implement procedures to safeguard against unauthorized access to or dissemination of Confidential Information using a reasonable standard of care, but no less than the same degree of security that the recipient uses to protect its own Confidential Information or similarly sensitive information.

## §380.6 Auditing payments and distributions.

(a) *General.* This section prescribes procedures by which any entity entitled to receive payment or distribution of royalties may verify payments or distributions by auditing the payor or distributor. The Collective may audit a Licensee's payments of royalties to the Collective, and a Copyright Owner or Performer may audit the Collective's distributions of royalties to the owner or performer. Nothing in this section shall preclude a verifying entity and the payor or distributor from agreeing to verification methods in addition to or different from those set forth in this section.

(b) *Frequency of auditing.* The verifying entity may conduct an audit of each licensee only once a year for any or all of the prior three calendar years. A verifying entity may not audit records for any calendar year more than once.

(c) *Notice of intent to audit.* The verifying entity must file with the Copyright Royalty Judges a notice of intent to audit the payor or distributor, which notice the Judges must publish in the FEDERAL REGISTER within 30 days of the filing of the notice. Simultaneously with the filing of the notice, the verifying entity must deliver a copy to the payor or distributor.

(d) *The audit.* The audit must be conducted during regular business hours by a Qualified Auditor who is not retained on a contingency fee basis and is identified in the notice. The auditor shall determine the accuracy of royalty payments or distributions, including whether an underpayment or overpayment of royalties was made. An audit of books and records, including underlying paperwork, performed in the ordinary course of business according to generally accepted auditing standards by a Qualified Auditor, shall serve as an acceptable verification procedure for all parties with respect to the information that is within the scope of the audit.

(e) *Access to third-party records for audit purposes.* The payor or distributor must use commercially reasonable efforts to obtain or to provide access to any relevant books and records maintained by third parties for the purpose of the audit.

(f) *Duty of auditor to consult.* The auditor must produce a written report to the verifying entity. Before rendering the report, unless the auditor has a reasonable basis to suspect fraud on the part of the payor or distributor, the disclosure of which would, in the reasonable opinion of the auditor, prejudice any investigation of the suspected fraud, the auditor must review tentative written findings of the audit with the appropriate agent or employee of the payor or distributor in order to remedy any factual errors and clarify

785

any issues relating to the audit; Provided that an appropriate agent or employee of the payor or distributor reasonably cooperates with the auditor to remedy promptly any factual error[s] or clarify any issues raised by the audit. The auditor must include in the written report information concerning the cooperation or the lack thereof of the employee or agent.

(g) *Audit results; underpayment or overpayment of royalties.* If the auditor determines the payor or distributor underpaid royalties, the payor or distributor shall remit the amount of any underpayment determined by the auditor to the verifying entity, together with interest at the rate specified in § 380.2(d). In the absence of mutually-agreed payment terms, which may, but need not, include installment payments, the payor or distributor shall remit promptly to the verifying entity the entire amount of the underpayment determined by the auditor. If the auditor determines the payor or distributor overpaid royalties, however, the verifying entity shall not be required to remit the amount of any overpayment to the payor or distributor, and the payor or distributor shall not seek by any means to recoup, offset, or take a credit for the overpayment, unless the payor or distributor and the verifying entity have agreed otherwise.

(h) *Paying the costs of the audit.* The verifying entity must pay the cost of the verification procedure, unless the auditor determines that there was an underpayment of 10% or more, in which case the payor or distributor must bear the reasonable costs of the verification procedure, in addition to paying or distributing the amount of any underpayment.

(i) *Retention of audit report.* The verifying party must retain the report of the audit for a period of not less than three years from the date of issuance.

## § 380.7 Definitions.

*Aggregate Tuning Hours (ATH)* means the total hours of programming that the Licensee has transmitted during the relevant period to all listeners within the United States from all channels and stations that provide audio programming consisting, in whole or in part, of eligible nonsubscription transmissions or noninteractive digital audio transmissions as part of a new subscription service, less the actual running time of any sound recordings for which the Licensee has obtained direct licenses apart from 17 U.S.C. 114(d)(2) or which do not require a license under United States copyright law. By way of example, if a service transmitted one hour of programming containing Performances to 10 listeners, the service's ATH would equal 10 hours. If three minutes of that hour consisted of transmission of a directly-licensed recording, the service's ATH would equal nine hours and 30 minutes (three minutes times 10 listeners creates a deduction of 30 minutes). As an additional example, if one listener listened to a service for 10 hours (and none of the recordings transmitted during that time was directly licensed), the service's ATH would equal 10 hours.

*Collective* means the collection and distribution organization that is designated by the Copyright Royalty Judges, and which, for the current rate period, is SoundExchange, Inc.

*Commercial Webcaster* means a Licensee, other than a Noncommercial Webcaster or Public Broadcaster, that makes Ephemeral Recordings and eligible digital audio transmissions of sound recordings pursuant to the statutory licenses under 17 U.S.C. 112(e) and 114(d)(2).

*Copyright owners* means sound recording copyright owners who are entitled to royalty payments made under Part 380 pursuant to the statutory licenses under 17 U.S.C. 112 and 114.

*Digital audio transmission* has the same meaning as in 17 U.S.C. 114(j).

*Eligible nonsubscription transmission* has the same meaning as in 17 U.S.C. 114(j).

*Eligible Transmission* means a subscription or nonsubscription transmission made by a Licensee that is subject to licensing under 17 U.S.C. 114(d)(2) and the payment of royalties under this part.

*Ephemeral recording* has the same meaning as in 17 U.S.C. 112.

*Licensee* means a Commercial Webcaster, a Noncommercial Webcaster, or any entity operating a

except where the auditor has a reasonable basis to suspect fraud and disclosure would, in the reasonable opinion of the auditor, prejudice the investigation of such suspected fraud, the auditor shall review the tentative written findings of the audit with the appropriate agent or employee of the Collective in order to remedy any factual errors and clarify any issues relating to the audit; Provided that the appropriate agent or employee of the Collective reasonably cooperates with the auditor to remedy promptly any factual errors or clarify any issues raised by the audit.

(g) *Costs of the verification procedure.* The Copyright Owner requesting the verification procedure shall pay the cost of the procedure, unless it is finally determined that there was an underpayment of 10% or more, in which case the Collective shall, in addition to paying the amount of any underpayment, bear the reasonable costs of the verification procedure.

### §384.8 Unclaimed funds.

If a Collective is unable to identify or locate a Copyright Owner who is entitled to receive a royalty payment under this part, the Collective shall retain the required payment in a segregated trust account for a period of 3 years from the date of payment. No claim to such payment shall be valid after the expiration of the 3-year period. After the expiration of this period, the Collective may apply the unclaimed funds to offset any costs deductible under 17 U.S.C. 114(g)(3). The foregoing shall apply notwithstanding the common law or statutes of any State.

## PART 385—RATES AND TERMS FOR USE OF MUSICAL WORKS UNDER COMPULSORY LICENSE FOR MAKING AND DISTRIBUTING OF PHYSICAL AND DIGITAL PHONORECORDS

**Subpart A—Physical Phonorecord Deliveries, Permanent Digital Downloads and Ringtones**

Sec.
385.1 General.
385.2 Definitions.
385.3 Royalty rates for making and distributing phonorecords.
385.4 Late payments.

**Subpart B—Interactive Streaming, Other Incidental Digital Phonorecord Deliveries and Limited Downloads**

385.10 General.
385.11 Definitions.
385.12 Calculation of royalty payments in general.
385.13 Minimum royalty rates and subscriber-based royalty floors for specific types of services.
385.14 Promotional royalty rate.
385.15 [Reserved]
385.16 Reproduction and distribution rights covered.
385.17 Effect of rates.

AUTHORITY: 17 U.S.C. 115, 801(b)(1), 804(b)(4).

SOURCE: 74 FR 4529, Jan. 26, 2009, unless otherwise noted.

## Subpart A—Physical Phonorecord Deliveries, Permanent Digital Downloads and Ringtones

### §385.1 General.

(a) *Scope.* This subpart establishes rates and terms of royalty payments for making and distributing phonorecords, including by means of digital phonorecord deliveries, in accordance with the provisions of 17 U.S.C. 115.

(b) *Legal compliance.* Licensees relying upon the compulsory license set forth in 17 U.S.C. 115 shall comply with the requirements of that section, the rates and terms of this subpart, and any other applicable regulations.

(c) *Relationship to voluntary agreements.* Notwithstanding the royalty rates and terms established in this subpart, the rates and terms of any license agreements entered into by Copyright Owners and Licensees shall apply in lieu of the rates and terms of this subpart to use of musical works within the scope of such agreements.

### §385.2 Definitions.

For purposes of this subpart, the following definitions apply:

*Copyright owners* are nondramatic musical work copyright owners who are entitled to royalty payments made under this subpart pursuant to the compulsory license under 17 U.S.C. 115.

*Digital phonorecord delivery* means a digital phonorecord delivery as defined in 17 U.S.C. 115(d).

*Licensee* is a person or entity that has obtained a compulsory license under 17 U.S.C. 115, and the implementing regulations, to make and distribute phonorecords of a nondramatic musical work, including by means of a digital phonorecord delivery.

*Permanent digital download* means a digital phonorecord delivery that is distributed in the form of a download that may be retained and played on a permanent basis.

*Ringtone* means a phonorecord of a partial musical work distributed as a digital phonorecord delivery in a format to be made resident on a telecommunications device for use to announce the reception of an incoming telephone call or other communication or message or to alert the receiver to the fact that there is a communication or message.

### § 385.3 Royalty rates for making and distributing phonorecords.

(a) *Physical phonorecord deliveries and permanent digital downloads.* For every physical phonorecord and permanent digital download made and distributed, the royalty rate payable for each work embodied in such phonorecord shall be either 9.1 cents or 1.75 cents per minute of playing time or fraction thereof, whichever amount is larger.

(b) *Ringtones.* For every ringtone made and distributed, the royalty rate payable for each work embodied therein shall be 24 cents.

### § 385.4 Late payments.

A Licensee shall pay a late fee of 1.5% per month, or the highest lawful rate, whichever is lower, for any payment received after the due date set forth in ( 201.19(e)(7)(i) of this title. Late fees shall accrue from the due date until payment is received by the Copyright Owner.

## Subpart B—Interactive Streaming, Other Incidental Digital Phonorecord Deliveries and Limited Downloads

### § 385.10 General.

(a) *Scope.* This subpart establishes rates and terms of royalty payments for interactive streams and limited downloads of musical works by subscription and nonsubscription digital music services in accordance with the provisions of 17 U.S.C. 115.

(b) *Legal compliance.* A licensee that makes or authorizes interactive streams or limited downloads of musical works through subscription or non-subscription digital music services pursuant to 17 U.S.C. 115 shall comply with the requirements of that section, the rates and terms of this subpart, and any other applicable regulations.

### § 385.11 Definitions.

For purposes of this subpart, the following definitions shall apply:

*Interactive stream* means a stream of a sound recording of a musical work, where the performance of the sound recording by means of the stream is not exempt under 17 U.S.C. 114(d)(1) and does not in itself or as a result of a program in which it is included qualify for statutory licensing under 17 U.S.C. 114(d)(2).

*Licensee* means a person that has obtained a compulsory license under 17 U.S.C. 115 and its implementing regulations.

*Licensed activity* means interactive streams or limited downloads of musical works, as applicable.

*Limited download* means a digital transmission of a sound recording of a musical work to an end user, other than a stream, that results in a specifically identifiable reproduction of that sound recording that is only accessible for listening for—

(1) An amount of time not to exceed 1 month from the time of the transmission (unless the service, in lieu of retransmitting the same sound recording as another limited download, separately and upon specific request of the end user made through a live network connection, reauthorizes use for another time period not to exceed 1

month), or in the case of a subscription transmission, a period of time following the end of the applicable subscription no longer than a subscription renewal period or 3 months, whichever is shorter; or

(2) A specified number of times not to exceed 12 (unless the service, in lieu of retransmitting the same sound recording as another limited download, separately and upon specific request of the end user made through a live network connection, reauthorizes use of another series of 12 or fewer plays), or in the case of a subscription transmission, 12 times after the end of the applicable subscription.

(3) A limited download is a general digital phonorecord delivery under 17 U.S.C. 115(c)(3)(C) and (D).

*Offering* means a service's offering of licensed activity that is subject to a particular rate set forth in §385.13(a) (e.g., a particular subscription plan available through the service).

*Promotional royalty rate* means the statutory royalty rate of zero in the case of certain promotional interactive streams and certain promotional limited downloads, as provided in §385.14.

*Publication date* means January 26, 2009.

*Record company* means a person or entity that

(1) Is a copyright owner of a sound recording of a musical work;

(2) In the case of a sound recording of a musical work fixed before February 15, 1972, has rights to the sound recording, under the common law or statutes of any State, that are equivalent to the rights of a copyright owner of a sound recording of a musical work under title 17, United States Code;

(3) Is an exclusive licensee of the rights to reproduce and distribute a sound recording of a musical work; or

(4) Performs the functions of marketing and authorizing the distribution of a sound recording of a musical work under its own label, under the authority of the copyright owner of the sound recording.

*Relevant page* means a page (including a Web page, screen or display) from which licensed activity offered by a service is directly available to end users, but only where the offering of licensed activity and content that directly relates to the offering of licensed activity (e.g., an image of the artist or artwork closely associated with such offering, artist or album information, reviews of such offering, credits and music player controls) comprises 75% or more of the space on that page, excluding any space occupied by advertising. A licensed activity is directly available to end users from a page if sound recordings of musical works can be accessed by end users for limited downloads or interactive streams from such page (in most cases this will be the page where the limited download or interactive stream takes place).

*Service* means that entity (which may or may not be the licensee) that, with respect to the licensed activity,

(1) Contracts with or has a direct relationship with end users in a case where a contract or relationship exists, or otherwise controls the content made available to end users;

(2) Is able to report fully on service revenue from the provision of the licensed activity to the public, and to the extent applicable, verify service revenue through an audit; and

(3) Is able to report fully on usage of musical works by the service, or procure such reporting, and to the extent applicable, verify usage through an audit.

*Service revenue.* (1) Subject to paragraphs (2) through (5) of the definition of "Service revenue," and subject to U.S. Generally Accepted Accounting Principles, *service revenue* shall mean the following:

(i) All revenue recognized by the service from end users from the provision of licensed activity;

(ii) All revenue recognized by the service by way of sponsorship and commissions as a result of the inclusion of third-party "in-stream" or "in-download" advertising as part of licensed activity (*i.e.*, advertising placed immediately at the start, end or during the actual delivery, by way of interactive streaming or limited downloads, as applicable, of a musical work); and

(iii) All revenue recognized by the service, including by way of sponsorship and commissions, as a result of the placement of third-party advertising on a relevant page of the service

or on any page that directly follows such relevant page leading up to and including the limited download or interactive streaming, as applicable, of a musical work; provided that, in the case where more than one service is actually available to end users from a relevant page, any advertising revenue shall be allocated between such services on the basis of the relative amounts of the page they occupy.

(2) In each of the cases identified in paragraph (1) of the definition of ''Service revenue,'' such revenue shall, for the avoidance of doubt,

(i) Include any such revenue recognized by the service, or if not recognized by the service, by any associate, affiliate, agent or representative of such service in lieu of its being recognized by the service;

(ii) Include the value of any barter or other nonmonetary consideration;

(iii) Not be reduced by credit card commissions or similar payment process charges; and

(iv) Except as expressly set forth in this subpart, not be subject to any other deduction or set-off other than refunds to end users for licensed activity that they were unable to use due to technical faults in the licensed activity or other bona fide refunds or credits issued to end users in the ordinary course of business.

(3) In each of the cases identified in paragraph (1) of the definition of ''Service revenue,'' such revenue shall, for the avoidance of doubt, exclude revenue derived solely in connection with services and activities other than licensed activity, provided that advertising or sponsorship revenue shall be treated as provided in paragraphs (2) and (4) of the definition of ''Service revenue.'' By way of example, the following kinds of revenue shall be excluded:

(i) Revenue derived from non-music voice, content and text services;

(ii) Revenue derived from other non-music products and services (including search services, sponsored searches and click-through commissions); and

(iii) Revenue derived from music or music-related products and services that are not or do not include licensed activity.

(4) For purposes of paragraph (1) of the definition of ''Service revenue,'' advertising or sponsorship revenue shall be reduced by the actual cost of obtaining such revenue, not to exceed 15%.

(5) Where the licensed activity is provided to end users as part of the same transaction with one or more other products or services that are not a music service engaged in licensed activity, then the revenue deemed to be recognized from end users for the service for the purpose of the definition in paragraph (1) of the definition of ''Service revenue'' shall be the revenue recognized from end users for the bundle less the standalone published price for end users for each of the other component(s) of the bundle; provided that, if there is no such standalone published price for a component of the bundle, then the average standalone published price for end users for the most closely comparable product or service in the U.S. shall be used or, if more than one such comparable exists, the average of such standalone prices for such comparables shall be used. In connection with such a bundle, if a record company providing sound recording rights to the service

(i) Recognizes revenue (in accordance with U.S. Generally Accepted Accounting Principles, and including for the avoidance of doubt barter or nonmonetary consideration) from a person or entity other than the service providing the licensed activity and;

(ii) Such revenue is received, in the context of the transactions involved, as consideration for the ability to make interactive streams or limited downloads of sound recordings, then such revenue shall be added to the amounts expensed by the service for purposes of § 385.13(b). Where the service is the licensee, if the service provides the record company all information necessary for the record company to determine whether additional royalties are payable by the service hereunder as a result of revenue recognized from a person or entity other than the service as described in the immediately preceding sentence, then the record company shall provide such further information as necessary for the service to calculate the additional royalties

and indemnify the service for such additional royalties. The sole obligation of the record company shall be to pay the licensee such additional royalties if actually payable as royalties hereunder; provided, however, that this shall not affect any otherwise existing right or remedy of the copyright owner nor diminish the licensee's obligations to the copyright owner.

*Stream* means the digital transmission of a sound recording of a musical work to an end user—

(1) To allow the end user to listen to the sound recording, while maintaining a live network connection to the transmitting service, substantially at the time of transmission, except to the extent that the sound recording remains accessible for future listening from a streaming cache reproduction;

(2) Using technology that is designed such that the sound recording does not remain accessible for future listening, except to the extent that the sound recording remains accessible for future listening from a streaming cache reproduction; and

(3) That is also subject to licensing as a public performance of the musical work.

*Streaming cache reproduction* means a reproduction of a sound recording of a musical work made on a computer or other receiving device by a service solely for the purpose of permitting an end user who has previously received a stream of such sound recording to play such sound recording again from local storage on such computer or other device rather than by means of a transmission; provided that the user is only able to do so while maintaining a live network connection to the service, and such reproduction is encrypted or otherwise protected consistent with prevailing industry standards to prevent it from being played in any other manner or on any device other than the computer or other device on which it was originally made.

*Subscription service* means a digital music service for which end users are required to pay a fee to access the service for defined subscription periods of 3 years or less (in contrast to, for example, a service where the basic charge to users is a payment per download or per play), whether such payment is made

for access to the service on a standalone basis or as part of a bundle with one or more other products or services, and including any use of such a service on a trial basis without charge as described in §385.14(b).

[74 FR 4529, Jan. 26, 2009, as amended at 74 FR 6834, Feb. 11, 2009]

**§385.12 Calculation of royalty payments in general.**

(a) *Applicable royalty.* Licensees that make or authorize licensed activity pursuant to 17 U.S.C. 115 shall pay royalties therefor that are calculated as provided in this section, subject to the minimum royalties and subscriber-based royalty floors for specific types of services provided in §385.13, except as provided for certain promotional uses in §385.14.

(b) *Rate calculation methodology.* Royalty payments for licensed activity shall be calculated as provided in paragraph (b) of this section. If a service includes different offerings, royalties must be separately calculated with respect to each such offering. Uses subject to the promotional royalty rate shall be excluded from the calculation of royalties due, as further described in this section and the following §385.13.

(1) *Step 1:* Calculate the All-In Royalty for the Service. For each accounting period, the all-in royalty for each offering of the service is the greater of

(i) The applicable percentage of service revenue as set forth in paragraph (c) of this section (excluding any service revenue derived solely from licensed activity uses subject to the promotional royalty rate), and

(ii) The minimum specified in §385.13 of the offering involved.

(2) *Step 2:* Subtract Applicable Performance Royalties. From the amount determined in step 1 in paragraph (b)(1) of this section, for each offering of the service, subtract the total amount of royalties for public performance of musical works that has been or will be expensed by the service pursuant to public performance licenses in connection with uses of musical works through such offering during the accounting period that constitute licensed activity (other than licensed activity subject to the promotional royalty rate). While this amount may be the total of the

service's payments for that offering for the accounting period under its agreements with performing rights societies as defined in 17 U.S.C. 101, it will be less than the total of such public performance payments if the service is also engaging in public performance of musical works that does not constitute licensed activity. In the latter case, the amount to be subtracted for public performance payments shall be the amount of such payments allocable to licensed activity uses (other than promotional royalty rate uses) through the relevant offering, as determined in relation to all uses of musical works for which the public performance payments are made for the accounting period. Such allocation shall be made on the basis of plays of musical works or, where per-play information is unavailable due to bona fide technical limitations as described in step 4 in paragraph (b)(4) of this section, using the same alternative methodology as provided in step 4.

(3) *Step 3:* Determine the Payable Royalty Pool. This is the amount payable for the reproduction and distribution of all musical works used by the service by virtue of its licensed activity for a particular offering during the accounting period. This amount is the greater of

(i) The result determined in step 2 in paragraph (b)(2) of this section, and

(ii) The subscriber-based royalty floor resulting from the calculations described in § 385.13.

(4) *Step 4:* Calculate the Per-Work Royalty Allocation for Each Relevant Work. This is the amount payable for the reproduction and distribution of each musical work used by the service by virtue of its licensed activity through a particular offering during the accounting period. To determine this amount, the result determined in step 3 in paragraph (b)(3) of this section must be allocated to each musical work used through the offering. The allocation shall be accomplished by dividing the payable royalty pool determined in step 3 for such offering by the total number of plays of all musical works through such offering during the accounting period (other than promotional royalty rate plays) to yield a per-play allocation, and multiplying

that result by the number of plays of each musical work (other than promotional royalty rate plays) through the offering during the accounting period. For purposes of determining the per-work royalty allocation in all calculations under this step 4 only (*i.e.,* after the payable royalty pool has been determined), for sound recordings of musical works with a playing time of over 5 minutes, each play on or after October 1, 2010 shall be counted as provided in paragraph (d) of this section. Notwithstanding the foregoing, if the service is not capable of tracking play information due to bona fide limitations of the available technology for services of that nature or of devices useable with the service, the per-work royalty allocation may instead be accomplished in a manner consistent with the methodology used by the service for making royalty payment allocations for the use of individual sound recordings.

(c) *Percentage of service revenue.* The percentage of service revenue applicable under paragraph (b) of this section is 10.5%, except that such percentage shall be discounted by 2% (*i.e.,* to 8.5%) in the case of licensed activity occurring on or before December 31, 2007.

(d) *Overtime adjustment.* For licensed activity on or after October 1, 2010, for purposes of the calculations in step 4 in paragraph (b)(4) of this section only, for sound recordings of musical works with a playing time of over 5 minutes, adjust the number of plays as follows:

(1) 5:01 to 6:00 minutes—Each play = 1.2 plays

(2) 6:01 to 7:00 minutes—Each play = 1.4 plays

(3) 7:01 to 8:00 minutes—Each play = 1.6 plays

(4) 8:01 to 9:00 minutes—Each play = 1.8 plays

(5) 9:01 to 10:00 minutes—Each play = 2.0 plays

(6) For playing times of greater than 10 minutes, continue to add .2 for each additional minute or fraction thereof.

(e) *Accounting.* The calculations required by paragraph (b) of this section shall be made in good faith and on the basis of the best knowledge, information and belief of the licensee at the time payment is due, and subject to

the additional accounting and certification requirements of 17 U.S.C. 115(c)(5) and §201.19 of this title. Without limitation, a licensee's statements of account shall set forth each step of its calculations with sufficient information to allow the copyright owner to assess the accuracy and manner in which the licensee determined the payable royalty pool and per-play allocations (including information sufficient to demonstrate whether and how a minimum royalty or subscriber-based royalty floor pursuant to §385.13 does or does not apply) and, for each offering reported, also indicate the type of licensed activity involved and the number of plays of each musical work (including an indication of any overtime adjustment applied) that is the basis of the per-work royalty allocation being paid.

§385.13 **Minimum royalty rates and subscriber-based royalty floors for specific types of services.**

(a) *In general.* The following minimum royalty rates and subscriber-based royalty floors shall apply to the following types of licensed activity:

(1) *Standalone non-portable subscription—streaming only.* Except as provided in paragraph (a)(4) of this section, in the case of a subscription service through which an end user can listen to sound recordings only in the form of interactive streams and only from a non-portable device to which such streams are originally transmitted while the device has a live network connection, the minimum for use in step 1 of §385.12(b)(1) is the lesser of subminimum II as described in paragraph (c) of this section for the accounting period and the aggregate amount of 50 cents per subscriber per month. The subscriber-based royalty floor for use in step 3 of §385.12(b)(3) is the aggregate amount of 15 cents per subscriber per month.

(2) *Standalone non-portable subscription—mixed.* Except as provided in paragraph (a)(4) of this section, in the case of a subscription service through which an end user can listen to sound recordings either in the form of interactive streams or limited downloads but only from a non-portable device to which such streams or downloads are origi-

nally transmitted, the minimum for use in step 1 of §385.12(b)(1) is the lesser of the subminimum I as described in paragraph (b) of this section for the accounting period and the aggregate amount of 50 cents per subscriber per month. The subscriber-based royalty floor for use in step 3 of §385.12(b)(3) is the aggregate amount of 30 cents per subscriber per month.

(3) *Standalone portable subscription service.* Except as provided in paragraph (a)(4) of this section, in the case of a subscription service through which an end user can listen to sound recordings in the form of interactive streams or limited downloads from a portable device, the minimum for use in step 1 of §385.12(b)(1) is the lesser of subminimum I as described in paragraph (b) of this section for the accounting period and the aggregate amount of 80 cents per subscriber per month. The subscriber-based royalty floor for use in step 3 of §385.12(b)(3) is the aggregate amount of 50 cents per subscriber per month.

(4) *Bundled subscription services.* In the case of a subscription service made available to end users with one or more other products or services as part of a single transaction without pricing for the subscription service separate from the product(s) or service(s) with which it is made available (e.g., a case in which a user can buy a portable device and one-year access to a subscription service for a single price), the minimum for use in step 1 of §385.12(b)(1) is subminimum I as described in paragraph (b) of this section for the accounting period. The subscriber-based royalty floor for use in step 3 of §385.12(b)(3) is the aggregate amount of 25 cents per month for each end user who has made at least one play of a licensed work during such month (each such end user to be considered an "active subscriber").

(5) *Free nonsubscription/ad-supported services.* In the case of a service offering licensed activity free of any charge to the end user, the minimum for use in step 1 of §385.12(b)(1) is subminimum II described in paragraph (c) of this section for the accounting period. There is no subscriber-based royalty floor for use in step 3 of §385.12(b)(3).

(b) *Computation of subminimum I.* For purposes of paragraphs (a)(2), (3) and (4) of this section, and with reference to paragraph (5) of the definition of "service revenue" in § 385.11 if applicable, subminimum I for an accounting period means the aggregate of the following with respect to all sound recordings of musical works used in the relevant offering of the service during the accounting period—

(1) In cases in which a record company is the licensee under 17 U.S.C. 115 and a third-party service has obtained from the record company the rights to make interactive streams or limited downloads of a sound recording together with the right to reproduce and distribute the musical work embodied therein, 17.36% of the total amount expensed by the service in accordance with U.S. Generally Accepted Accounting Principles, which for the avoidance of doubt shall include the value of any barter or other nonmonetary consideration provided by the service, for such rights for the accounting period, except that for licensed activity occurring on or before December 31, 2007, subminimum I for an accounting period shall be 14.53% of the amount expensed by the service for such rights for the accounting period.

(2) In cases in which the relevant service is the licensee under 17 U.S.C. 115 and the relevant service has obtained from a third-party record company the rights to make interactive streams or limited downloads of a sound recording without the right to reproduce and distribute the musical work embodied therein, 21% of the total amount expensed by the service in accordance with U.S. Generally Accepted Accounting Principles, which for the avoidance of doubt shall include the value of any barter or other nonmonetary consideration provided by the service, for such sound recording rights for the accounting period, except that for licensed activity occurring on or before December 31, 2007, subminimum I for an accounting period shall be 17% of the amount expensed by the service for such sound recording rights for the accounting period.

(c) *Computation of subminimum II.* For purposes of paragraphs (a)(1) and (5) of this section, subminimum II for an accounting period means the aggregate of the following with respect to all sound recordings of musical works used by the relevant service during the accounting period—

(1) In cases in which a record company is the licensee under 17 U.S.C. 115 and a third-party service has obtained from the record company the rights to make interactive streams and limited downloads of a sound recording together with the right to reproduce and distribute the musical work embodied therein, 18% of the total amount expensed by the service in accordance with U.S. Generally Accepted Accounting Principles, which for the avoidance of doubt shall include the value of any barter or other nonmonetary consideration provided by the service, for such rights for the accounting period, except that for licensed activity occurring on or before December 31, 2007, subminimum II for an accounting period shall be 14.53% of the amount expensed by the service for such rights for the accounting period.

(2) In cases in which the relevant service is the licensee under 17 U.S.C. 115 and the relevant service has obtained from a third-party record company the rights to make interactive streams or limited downloads of a sound recording without the right to reproduce and distribute the musical work embodied therein, 22% of the total amount expensed by the service in accordance with U.S. Generally Accepted Accounting Principles, which for the avoidance of doubt shall include the value of any barter or other nonmonetary consideration provided by the service, for such sound recording rights for the accounting period, except that for licensed activity occurring on or before December 31, 2007, subminimum II for an accounting period shall be 17% of the amount expensed by the service for such sound recording rights for the accounting period.

(d) *Computation of subscriber-based royalty rates.* For purposes of paragraph (a) of this section, to determine the minimum or subscriber-based royalty floor, as applicable to any particular offering, the service shall for the relevant offering calculate its total number of subscriber-months for the accounting period, taking into account

all end users who were subscribers for complete calendar months, prorating in the case of end users who were subscribers for only part of a calendar month, and deducting on a prorated basis for end users covered by a free trial period subject to the promotional royalty rate as described in §385.14(b)(2), except that in the case of a bundled subscription service, subscriber-months shall instead be determined with respect to active subscribers as defined in paragraph (a)(4) of this section. The product of the total number of subscriber-months for the accounting period and the specified number of cents per subscriber (or active subscriber, as the case may be) shall be used as the subscriber-based component of the minimum or subscriber-based royalty floor, as applicable, for the accounting period.

### §385.14 Promotional royalty rate.

(a) *General provisions.* (1) This section establishes a royalty rate of zero in the case of certain promotional interactive streaming activities, and of certain promotional limited downloads offered in the context of a free trial period for a digital music subscription service under a license pursuant to 17 U.S.C. 115. Subject to the requirements of 17 U.S.C. 115 and the additional provisions of paragraphs (b) through (e) of this section, the promotional royalty rate shall apply to a musical work when a record company transmits or authorizes the transmission of interactive streams or limited downloads of a sound recording that embodies such musical work, only if—

(i) The primary purpose of the record company in making or authorizing the interactive streams or limited downloads is to promote the sale or other paid use of sound recordings by the relevant artists, including such sound recording, through established retail channels or the paid use of one or more established retail music services through which the sound recording is available, and not to promote any other good or service;

(ii) Either—

(A) The sound recording (or a different version of the sound recording embodying the same musical work) is being lawfully distributed and offered to consumers through the established retail channels or services described in paragraph (a)(1)(i) of this section; or

(B) In the case of a sound recording of a musical work being prepared for commercial release but not yet released, the record company has a good faith intention of lawfully distributing and offering to consumers the sound recording (or a different version of the sound recording embodying the same musical work) through the established retail channels or services described in paragraph (a)(1)(i) of this section within 90 days after the commencement of the first promotional use authorized under this section (and in fact does so, unless it can demonstrate that notwithstanding its bona fide intention, it unexpectedly did not meet the scheduled release date);

(iii) In connection with authorizing the promotional interactive streams or limited downloads, the record company has obtained from the service it authorizes a written representation that—

(A) In the case of a promotional use commencing on or after October 1, 2010, except interactive streaming subject to paragraph (d) of this section, the service agrees to maintain for a period of no less than 5 years from the conclusion of the promotional activity complete and accurate records of the relevant authorization and dates on which the promotion was conducted, and identifying each sound recording of a musical work made available through the promotion, the licensed activity involved, and the number of plays of such recording;

(B) The service is in all material respects operating with appropriate license authority with respect to the musical works it is using for promotional and other purposes; and

(C) The representation is signed by a person authorized to make the representation on behalf of the service;

(iv) Upon receipt by the record company of written notice from the copyright owner of a musical work or agent of the copyright owner stating in good faith that a particular service is in a material manner operating without appropriate license authority from such copyright owner, the record company shall within 5 business days withdraw

by written notice its authorization of such uses of such copyright owner's musical works under the promotional royalty rate by that service;

(v) The interactive streams or limited downloads are offered free of any charge to the end user and, except in the case of interactive streaming subject to paragraph (d) of this section in the case of a free trial period for a digital music subscription service, no more than 5 sound recordings at a time are streamed in response to any individual request of an end user;

(vi) The interactive streams and limited downloads are offered in a manner such that the user is at the same time (e.g., on the same Web page) presented with a purchase opportunity for the relevant sound recording or an opportunity to subscribe to a paid service offering the sound recording, or a link to such a purchase or subscription opportunity, except—

(A) In the case of interactive streaming of a sound recording being prepared for commercial release but not yet released, certain mobile applications or other circumstances in which the foregoing is impracticable in view of the current state of the relevant technology; and

(B) In the case of a free trial period for a digital music subscription service, if end users are periodically offered an opportunity to subscribe to the service during such free trial period; and

(vii) The interactive streams and limited downloads are not provided in a manner that is likely to cause mistake, to confuse or to deceive, reasonable end users as to the endorsement or association of the author of the musical work with any product, service or activity other than the sale or paid use of sound recordings or paid use of a music service through which sound recordings are available. Without limiting the foregoing, upon receipt of written notice from the copyright owner of a musical work or agent of the copyright owner stating in good faith that a particular use of such work under this section violates the limitation set forth in this paragraph (a)(1)(vii), the record company shall promptly cease such use of that work, and within 5 business days withdraw by written notice its authorization of such use by all relevant third parties it has authorized under this section.

(2) To rely upon the promotional royalty rate, a record company making or authorizing interactive streams or limited downloads shall keep complete and accurate contemporaneous written records of such uses, including the sound recordings and musical works involved, the artists, the release dates of the sound recordings, a brief statement of the promotional activities authorized, the identity of the service or services where each promotion is authorized (including the Internet address if applicable), the beginning and end date of each period of promotional activity authorized, and the representation required by paragraph (a)(1)(iii) of this section; provided that, in the case of trial subscription uses, such records shall instead consist of the contractual terms that bear upon promotional uses by the particular digital music subscription services it authorizes; and further provided that, if the record company itself is conducting the promotion, it shall also maintain any additional records described in paragraph (a)(1)(iii)(A) of this section. The records required by this paragraph (a)(2) shall be maintained for no less time than the record company maintains records of usage of royalty-bearing uses involving the same type of licensed activity in the ordinary course of business, but in no event for less than 5 years from the conclusion of the promotional activity to which they pertain. If the copyright owner of a musical work or its agent requests a copy of the information to be maintained under this paragraph (a)(2) with respect to a specific promotion or relating to a particular sound recording of a musical work, the record company shall provide complete and accurate documentation within 10 business days, except for any information required under paragraph (a)(1)(iii)(A) of this section, which shall be provided within 20 business days, and provided that if the copyright owner or agent requests information concerning a large volume of promotions or sound recordings, the record company shall have a reasonable time, in view of the amount of information requested, to respond to any

request of such copyright owner or agent. If the record company does not provide required information within the required time, and upon receipt of written notice citing such failure does not provide such information within a further 10 business days, the uses will be considered not to be subject to the promotional royalty rate and the record company (but not any third-party service it has authorized) shall be liable for any payment due for such uses; provided, however, that all rights and remedies of the copyright owner with respect to unauthorized uses shall be preserved.

(3) If the copyright owner of a musical work or its agent requests a copy of the information to be maintained under paragraph (a)(1)(iii)(A) of this section by a service authorized by a record company with respect to a specific promotion, the service shall provide complete and accurate documentation within 20 business days, provided that if the copyright owner or agent requests information concerning a large volume of promotions or sound recordings, the service shall have a reasonable time, in view of the amount of information requested, to respond to any request of such copyright owner or agent. If the service does not provide required information within the required time, and upon receipt of written notice citing such failure does not provide such information within a further 10 business days, the uses will be considered not to be subject to the promotional royalty rate and the service (but not the record company) will be liable for any payment due for such uses; provided, however, that all rights and remedies of the copyright owner with respect to unauthorized uses shall be preserved.

(4) The promotional royalty rate is exclusively for audio-only interactive streaming and limited downloads of musical works subject to licensing under 17 U.S.C. 115. The promotional royalty rate does not apply to any other use under 17 U.S.C. 115; nor does it apply to public performances, audiovisual works, lyrics or other uses outside the scope of 17 U.S.C. 115. Without limitation, uses subject to licensing under 17 U.S.C. 115 that do not qualify for the promotional royalty rate (in-cluding without limitation interactive streaming or limited downloads of a musical work beyond the time limitations applicable to the promotional royalty rate) require payment of applicable royalties. This section is based on an understanding of industry practices and market conditions at the time of its development, among other things. The terms of this section shall be subject to de novo review and consideration (or elimination altogether) in future proceedings before the Copyright Royalty Judges. Nothing in this section shall be interpreted or construed in such a manner as to nullify or diminish any limitation, requirement or obligation of 17 U.S.C. 115 or other protection for musical works afforded by the Copyright Act, 17 U.S.C. 101 *et seq.*

(b) *Interactive streaming and limited downloads of full-length musical works through third-party services.* In addition to those of paragraph (a) of this section, the provisions of this paragraph (b) apply to interactive streaming, and limited downloads (in the context of a free trial period for a digital music subscription service), authorized by record companies under the promotional royalty rate through third-party services (including Web sites) that is not subject to paragraphs (c) or (d) of this section. Such interactive streams and limited downloads may be made or authorized by a record company under the promotional royalty rate only if—

(1) No cash, other monetary payment, barter or other consideration for making or authorizing the relevant interactive streams or limited downloads is received by the record company, its parent company, any entity owned in whole or in part by or under common ownership with the record company, or any other person or entity acting on behalf of or in lieu of the record company, except for in-kind promotional consideration used to promote the sale or paid use of sound recordings or the paid use of music services through which sound recordings are available;

(2) In the case of interactive streaming and limited downloads offered in the context of a free trial period for a digital music subscription service, the

free trial period does not exceed 30 consecutive days per subscriber per two-year period; and

(3) In contexts other than a free trial period for a digital music subscription service, interactive streaming subject to paragraph (b) of this section of a particular sound recording is authorized by the record company on no more than 60 days total for all services (*i.e.*, interactive streaming under paragraph (b) of this section of a particular sound recording may be authorized on no more than a total of 60 days, which need not be consecutive, and on any one such day, interactive streams may be offered on one or more services); provided, however, that an additional 60 days shall be available each time the sound recording is re-released by the record company in a remastered form or as a part of a compilation with a different set of sound recordings than the original release or any prior compilation including such sound recording.

(4) In the event that a record company authorizes promotional uses in excess of the time limitations of paragraph (b) of this section, the record company, and not the third-party service it has authorized, shall be liable for any payment due for such uses; provided, however, that all rights and remedies of the copyright owner with respect to unauthorized uses shall be preserved. In the event that a third-party service exceeds the scope of any authorization by a record company, the service, and not the record company, shall be liable for any payment due for such uses; provided, however, that all rights and remedies of the copyright owner with respect to unauthorized uses shall be preserved.

(c) *Interactive streaming of full-length musical works through record company and artist services.* In addition to those of paragraph (a) of this section, the provisions of this paragraph (c) apply to interactive streaming conducted or authorized by record companies under the promotional royalty rate through a service (e.g., a Web site) directly owned or operated by the record company, or directly owned or operated by a recording artist under the authorization of the record company, and that is not subject to paragraph (d) of this section. For the avoidance of doubt and without

limitation, an artist page or site on a third-party service (e.g., a social networking service) shall not be considered a service operated by the record company or artist. Such interactive streams may be made or authorized by a record company under the promotional royalty rate only if—

(1) The interactive streaming subject to this paragraph (c) of a particular sound recording is offered or authorized by the record company on no more than 90 days total for all services (*i.e.*, interactive streaming under this paragraph (c) of a particular sound recording may be authorized on no more than a total of 90 days, which need not be consecutive, and on any such day, interactive streams may be offered on one or more services operated by the record company or artist, subject to the provisions of paragraph (b)(2) of this section); provided, however, that an additional 90 days shall be available each time the sound recording is re-released by the record company in a remastered form or as part of a compilation with a different set of sound recordings than prior compilations that include that sound recording;

(2) In the case of interactive streaming through a service devoted to one featured artist, the interactive streams subject to this paragraph (c) of this section of a particular sound recording are made or authorized by the record company on no more than one official artist site per artist and are recordings of that artist; and

(3) In the case of interactive streaming through a service that is not limited to a single featured artist, all interactive streaming on such service (whether eligible for the promotional royalty rate or not) is limited to sound recordings of a single record company and its affiliates and the service would not reasonably be considered to be a meaningful substitute for a paid music service.

(d) *Interactive streaming of clips.* In addition to those in paragraph (a) of this section, the provisions of this paragraph (d) apply to interactive streaming conducted or authorized by record companies under the promotional royalty rate of segments of sound recordings of musical works with a playing

time that does not exceed the greater of:

(1) 30 seconds, or

(2) 10% of the playing time of the complete sound recording, but in no event in excess of 60 seconds. Such interactive streams may be made or authorized by a record company under the promotional royalty rate without any of the temporal limitations set forth in paragraphs (b) and (c) of this section (but subject to the other conditions of paragraphs (b) and (c) of this section, as applicable). For clarity, this paragraph (d) is strictly limited to the uses described herein and shall not be construed as permitting the creation or use of an excerpt of a musical work in violation of 17 U.S.C. 106(2) or 115(a)(2)

or any other right of a musical work owner.

[74 FR 4529, Jan. 26, 2009, as amended at 74 FR 6834, Feb. 11, 2009]

**§ 385.15   [Reserved]**

**§ 385.16   Reproduction and distribution rights covered.**

A compulsory license under 17 U.S.C. 115 extends to all reproduction and distribution rights that may be necessary for the provision of the licensed activity, solely for the purpose of providing such licensed activity (and no other purpose).

**§ 385.17   Effect of rates.**

In any future proceedings under 17 U.S.C. 115(c)(3)(C) and (D), the royalty rates payable for a compulsory license shall be established de novo.

Song titles and ISRC numbers of all songs to be audited for accrued royalty rates/ retroactive pay (stream data) constituted by the Copyright Royalty Board and Southern District.

*Artist name: MeDiAAiDeM*
*Album title: "A metronome sang farewell"*
*Released 8/28/2018 on Spotify.com via LandR.com.*

1. Morale, an intro for an outro..............QZ-DXH-18-00001
2. More than you can..........................QZ-DXH-18-00002
3. I do, take me higher........................QZ-DXH-18-00003
4. Breaking news...............................QZ-DXH-18-00004
5. Let's be famous.............................QZ-DXH-18-00005
6. Tramp.......................................QZ-DXH-18-00006
7. Verde, off beat.............................QZ-DXH-18-00007
8. Take another sniff..........................QZ-DXH-18-00008
9. We don't give a what........................QZ-DXH-18-00009
10. Frankly, I'm...............................QZ-DXH-18-00010
11. Good drug.................................QZ-DXH-18-00011
12. Xeno cowboy...............................QZ-DXH-18-00012
13. Why do you try............................QZ-DXH-18-00013
14. Vanity....................................QZ-DXH-18-00014
15. Quit being hard...........................QZ-DXH-18-00015
16. Zenith...................................QZ-DXH-18-00016
17. A metronome sang farewell.................QZ-DXH-18-00017

-------------------------------------------------------------------

*{Singles}*
*Released 9/14/2018 on Spotify.com via LandR.com.*

18. Breaking news (Director's cut)..............QZ-DXH-18-00018

*Released 12/14/2018 on Spotify.com via LandR.com.*
19. I might (An intermission)....................QZ-DXH-18-00019


MeDiAAiDeM is a pseudonym (aka), for Jacoub Solomon.

All songs are written, produced, engineered, recorded, performed and 100% owned by MeDiAAiDeM aka Jacoub Solomon. No other label, publisher nor person is entitled to any percentage of songs or has contributed to his work.

Info from Bmi.Com

« Back to FAQs

Royalties

## How does BMI split royalties between songwriters and publishers?

▶

## Does BMI offer direct deposit?

▶

## What is the difference between performing right royalties, mechanical royalties and sync royalties?

## How does BMI pay royalties?

▶

## What do I do if my song is being played on radio, TV or Internet?

▶

## What happens to royalty payments when a writer or publisher dies?

## I found an old check. Can it still be deposited?

▶

## A distribution check was issued to my account but I still have not received it. What can I do?

## My song has recently received airplay. When will I receive my performance royalties?

It is at least nine months from the date of performance until the royalties generated for the performances are distributed. For more information **please see our Royalty Policy Manual**.

## Can I direct deposit my royalties into a bank outside of the United States?

Proof of
Registration/
BMI

# BMI Work Registration Report for SOLOMON JACOUB

From: Works Registration (WorksRegistrations@bmi.com)

To: JACOUBSOLOMON@YAHOO.COM

Date: Wednesday, November 21, 2018, 2:17 PM EST

BMI Work Registration Report
----------------------------

Please note that the information submitted will not appear immediately in BMI's online repertoire. The information will be available online as soon as possible.

-------------------------------------------------------------------------------------------
Work Title: MORALE AN INTRO FOR AN OUTRO
Registration Date: 11/20/2018
Status: Successfully Registered
BMI Work No: 028795924

Publisher(s): AFFILIATION ROLE IP NAME # OWN. SHARE COLL. SHARE
EXCESS WRITER CLEARANCE NA Original Publisher 00000000000 0.00% 0.00%

Writer(s): AFFILIATION ROLE IP NAME # SHARE
JACOUB SOLOMON BMI Composer/Author 00591946602 200.00%

-------------------------------------------------------------------------------------------
Work Title: I DO TAKE ME HIGHER
Registration Date: 11/20/2018
Status: Successfully Registered
BMI Work No: 028795926

Publisher(s): AFFILIATION ROLE IP NAME # OWN. SHARE COLL. SHARE
EXCESS WRITER CLEARANCE NA Original Publisher 00000000000 0.00% 0.00%

Writer(s): AFFILIATION ROLE IP NAME # SHARE
JACOUB SOLOMON BMI Composer/Author 00591946602 200.00%

-------------------------------------------------------------------------------------------
Work Title: MORE THAN YOU CAN
Registration Date: 11/20/2018
Status: Successfully Registered
BMI Work No: 028795928

Publisher(s): AFFILIATION ROLE IP NAME # OWN. SHARE COLL. SHARE
EXCESS WRITER CLEARANCE NA Original Publisher 00000000000 0.00% 0.00%

Writer(s): AFFILIATION ROLE IP NAME # SHARE
JACOUB SOLOMON BMI Composer/Author 00591946602 200.00%

-------------------------------------------------------------------------------------------
Work Title: VANITY
Registration Date: 11/20/2018
Status: Successfully Registered
BMI Work No: 028795962

Publisher(s): AFFILIATION ROLE IP NAME # OWN. SHARE COLL. SHARE
EXCESS WRITER CLEARANCE NA Original Publisher 00000000000 0.00% 0.00%

Writer(s): AFFILIATION ROLE IP NAME # SHARE
JACOUB SOLOMON BMI Composer/Author 00591946602 200.00%

---------------------------------------------------------------------------------------------------------

Work Title: ZENITH
Registration Date: 11/20/2018
Status: Successfully Registered
BMI Work No: 028795964

Publisher(s): AFFILIATION ROLE IP NAME # OWN. SHARE COLL. SHARE
EXCESS WRITER CLEARANCE NA Original Publisher 00000000000 0.00% 0.00%

Writer(s): AFFILIATION ROLE IP NAME # SHARE
JACOUB SOLOMON BMI Composer/Author 00591946602 200.00%

---------------------------------------------------------------------------------------------------------

Work Title: QUIT BEING HARD
Registration Date: 11/20/2018
Status: Successfully Registered
BMI Work No: 028795966

Publisher(s): AFFILIATION ROLE IP NAME # OWN. SHARE COLL. SHARE
EXCESS WRITER CLEARANCE NA Original Publisher 00000000000 0.00% 0.00%

Writer(s): AFFILIATION ROLE IP NAME # SHARE
JACOUB SOLOMON BMI Composer/Author 00591946602 200.00%

---------------------------------------------------------------------------------------------------------

Work Title: WHY DO YOU TRY
Registration Date: 11/20/2018
Status: Successfully Registered
BMI Work No: 028795968

Publisher(s): AFFILIATION ROLE IP NAME # OWN. SHARE COLL. SHARE
EXCESS WRITER CLEARANCE NA Original Publisher 00000000000 0.00% 0.00%

Writer(s): AFFILIATION ROLE IP NAME # SHARE
JACOUB SOLOMON BMI Composer/Author 00591946602 200.00%

---------------------------------------------------------------------------------------------------------

Work Title: A METRONOME SANG FAREWELL
Registration Date: 11/20/2018
Status: Successfully Registered
BMI Work No: 028795983

Publisher(s): AFFILIATION ROLE IP NAME # OWN. SHARE COLL. SHARE
EXCESS WRITER CLEARANCE NA Original Publisher 00000000000 0.00% 0.00%

Writer(s): AFFILIATION ROLE IP NAME # SHARE
JACOUB SOLOMON BMI Composer/Author 00591946602 200.00%

---------------------------------------------------------------------------------------------------------

Work Title: TRAMP
Registration Date: 11/20/2018
Status: Successfully Registered
BMI Work No: 028795988

Publisher(s): AFFILIATION ROLE IP NAME # OWN. SHARE COLL. SHARE
EXCESS WRITER CLEARANCE NA Original Publisher 00000000000 0.00% 0.00%

Writer(s): AFFILIATION ROLE IP NAME # SHARE
JACOUB SOLOMON BMI Composer/Author 00591946602 200.00%

---

Work Title: VERDE OFF BEAT
Registration Date: 11/20/2018
Status: Successfully Registered
BMI Work No: 028795990

Publisher(s): AFFILIATION ROLE IP NAME # OWN. SHARE COLL. SHARE
EXCESS WRITER CLEARANCE NA Original Publisher 00000000000 0.00% 0.00%

Writer(s): AFFILIATION ROLE IP NAME # SHARE
JACOUB SOLOMON BMI Composer/Author 00591946602 200.00%

---

Work Title: TAKE ANOTHER SNIFF
Registration Date: 11/20/2018
Status: Successfully Registered
BMI Work No: 028795991

Publisher(s): AFFILIATION ROLE IP NAME # OWN. SHARE COLL. SHARE
EXCESS WRITER CLEARANCE NA Original Publisher 00000000000 0.00% 0.00%

Writer(s): AFFILIATION ROLE IP NAME # SHARE
JACOUB SOLOMON BMI Composer/Author 00591946602 200.00%

---

Work Title: WE DONT GIVE A WHAT
Registration Date: 11/20/2018
Status: Successfully Registered
BMI Work No: 028795993

Publisher(s): AFFILIATION ROLE IP NAME # OWN. SHARE COLL. SHARE
EXCESS WRITER CLEARANCE NA Original Publisher 00000000000 0.00% 0.00%

Writer(s): AFFILIATION ROLE IP NAME # SHARE
JACOUB SOLOMON BMI Composer/Author 00591946602 200.00%

---

Work Title: GOOD DRUG
Registration Date: 11/20/2018
Status: Successfully Registered
BMI Work No: 028796000

Publisher(s): AFFILIATION ROLE IP NAME # OWN. SHARE COLL. SHARE
EXCESS WRITER CLEARANCE NA Original Publisher 00000000000 0.00% 0.00%

Writer(s): AFFILIATION ROLE IP NAME # SHARE
JACOUB SOLOMON BMI Composer/Author 00591946602 200.00%

---

Work Title: XENO COWBOY
Registration Date: 11/20/2018
Status: Successfully Registered
BMI Work No: 028796004

Publisher(s): AFFILIATION ROLE IP NAME # OWN. SHARE COLL. SHARE
EXCESS WRITER CLEARANCE NA Original Publisher 00000000000 0.00% 0.00%

Writer(s): AFFILIATION ROLE IP NAME # SHARE

JACOUB SOLOMON BMI Composer/Author 00591946602 200.00%

---------------------------------------------------------------------------------------
Work Title: FRANKLY IM
Registration Date: 11/20/2018
Status: Successfully Registered
BMI Work No: 028796007

Publisher(s): AFFILIATION ROLE IP NAME # OWN. SHARE COLL. SHARE
EXCESS WRITER CLEARANCE NA Original Publisher 00000000000 0.00% 0.00%

Writer(s): AFFILIATION ROLE IP NAME # SHARE
JACOUB SOLOMON BMI Composer/Author 00591946602 200.00%

---------------------------------------------------------------------------------------
Work Title: LETS BE FAMOUS
Registration Date: 11/20/2018
Status: Successfully Registered
BMI Work No: 028796017

Publisher(s): AFFILIATION ROLE IP NAME # OWN. SHARE COLL. SHARE
EXCESS WRITER CLEARANCE NA Original Publisher 00000000000 0.00% 0.00%

Writer(s): AFFILIATION ROLE IP NAME # SHARE
JACOUB SOLOMON BMI Composer/Author 00591946602 200.00%

---------------------------------------------------------------------------------------

Registrations listed with a status of 'Successfully Registered' are accepted and are subject to all the warranties as to authorship and/or ownership of the publisher's share of performance rights set forth in the applicable contracts between the writer(s) and publisher(s) claiming rights in the works.

BMI reserves the right to exclude any work in its entirety from the provisions of our agreements with the writer(s) and publisher(s) and to withdraw the registration if BMI in its sole judgment regards the work as a possible infringement of another work.

We bring to your attention that in the event a registration submitted does not properly indicate that a work is based on a public domain source, we reserve the right, if at any time such work is found to have a public domain source, to allocate to such a work twenty percent of the normal logging credit.

** BMI DISCLAIMER ** This message is intended only for the use of the Addressee and may contain information that is PRIVILEGED and CONFIDENTIAL. If you are not the intended recipient, you are hereby notified that any dissemination of this communication is strictly prohibited. If you have received this communication in error, please erase all copies of the message and its attachments and notify us immediately. Thank you.

# BMI Work Registration Report for SOLOMON JACOUB

From: Works Registration (WorksRegistrations@bmi.com)

To: JACOUBSOLOMON@YAHOO.COM

Date: Friday, November 30, 2018, 1:05 AM EST

BMI Work Registration Report
----------------------------

Please note that the information submitted will not appear immediately in BMI's online repertoire. The information will be available online as soon as possible.

------------------------------------------------------------------------------------------------------

Work Title: BREAKING NEWS
Registration Date: 11/26/2018
Status: Successfully Registered
BMI Work No: 028795932

Publisher(s): AFFILIATION ROLE IP NAME # OWN. SHARE COLL. SHARE
EXCESS WRITER CLEARANCE NA Original Publisher 00000000000 0.00% 0.00%

Writer(s): AFFILIATION ROLE IP NAME # SHARE
JACOUB SOLOMON BMI Composer/Author 00591946602 200.00%

------------------------------------------------------------------------------------------------------

Work Title: BREAKING NEWS DIRECTORS CUT
Registration Date: 11/26/2018
Status: Successfully Registered
BMI Work No: 028795985

Publisher(s): AFFILIATION ROLE IP NAME # OWN. SHARE COLL. SHARE
EXCESS WRITER CLEARANCE NA Original Publisher 00000000000 0.00% 0.00%

Writer(s): AFFILIATION ROLE IP NAME # SHARE
JACOUB SOLOMON BMI Composer/Author 00591946602 200.00%

------------------------------------------------------------------------------------------------------

Registrations listed with a status of 'Successfully Registered' are accepted and are subject to all the warranties as to authorship and/or ownership of the publisher's share of performance rights set forth in the applicable contracts between the writer(s) and publisher(s) claiming rights in the works.

BMI reserves the right to exclude any work in its entirety from the provisions of our agreements with the writer(s) and publisher(s) and to withdraw the registration if BMI in its sole judgment regards the work as a possible infringement of another work.

We bring to your attention that in the event a registration submitted does not properly indicate that a work is based on a public domain source, we reserve the right, if at any time such work is found to have a public domain source, to allocate to such a work twenty percent of the normal logging credit.

** BMI DISCLAIMER ** This message is intended only for the use of the Addressee and may contain information that is PRIVILEGED and CONFIDENTIAL. If you are not the intended recipient, you are hereby notified that any dissemination of this communication is strictly prohibited. If you have received this communication in error, please erase all copies of the message and its attachments and notify us immediately. Thank you.

# BMI Work Registration Report for SOLOMON JACOUB

From: Works Registration (WorksRegistrations@bmi.com)

To: JACOUBSOLOMON@YAHOO.COM

Date: Wednesday, December 19, 2018, 1:18 AM EST

BMI Work Registration Report
----------------------------

Please note that the information submitted will not appear immediately in BMI's online repertoire. The information will be available online as soon as possible.

-----------------------------------------------------------------------------------------------

Work Title: I MIGHT AN INTERMISSION
Registration Date: 12/17/2018
Status: Successfully Registered
BMI Work No: 029023540

Publisher(s): AFFILIATION ROLE IP NAME # OWN. SHARE COLL. SHARE
EXCESS WRITER CLEARANCE NA Original Publisher 00000000000 0.00% 0.00%

Writer(s): AFFILIATION ROLE IP NAME # SHARE
MEDIAAIDEM BMI Composer/Author 00366578121 200.00%

-----------------------------------------------------------------------------------------------

Registrations listed with a status of 'Successfully Registered' are accepted and are subject to all the warranties as to authorship and/or ownership of the publisher's share of performance rights set forth in the applicable contracts between the writer(s) and publisher(s) claiming rights in the works.

BMI reserves the right to exclude any work in its entirety from the provisions of our agreements with the writer(s) and publisher(s) and to withdraw the registration if BMI in its sole judgment regards the work as a possible infringement of another work.

We bring to your attention that in the event a registration submitted does not properly indicate that a work is based on a public domain source, we reserve the right, if at any time such work is found to have a public domain source, to allocate to such a work twenty percent of the normal logging credit.

** BMI DISCLAIMER ** This message is intended only for the use of the Addressee and may contain information that is PRIVILEGED and CONFIDENTIAL. If you are not the intended recipient, you are hereby notified that any dissemination of this communication is strictly prohibited. If you have received this communication in error, please erase all copies of the message and its attachments and notify us immediately. Thank you.